**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED APRIL 2, 2009

In re ROOD, Minor.

_____

DEPARTMENT OF HUMAN SERVICES,

       Petitioner-Appellant,

v                                    No. 136849

DARROLL DONALD ROOD,

       Respondent-Appellee.

_____

BEFORE THE ENTIRE BENCH (except HATHAWAY, J.)

CORRIGAN, J.

The Department of Human Services (DHS) challenges reversal by the Court of Appeals of a circuit court order terminating the respondent father's parental rights to his daughter. *In re Rood,* unpublished opinion per curiam of the Court of Appeals, issued June 12, 2008 (Docket No. 280597). We affirm the judgment of the Court of Appeals. As that court opined, respondent behaved as a "less-than-ideal parent" and "shares responsibility" for his lack of communication with the DHS and the court. *Id.* at 3. But the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary

custody of their child to the State." *Santosky v Kramer,* 455 US 745, 753; 102 S

Ct 1388; 71 L Ed 2d 599 (1982). Accordingly, "[w]hen the State moves to destroy

weakened familial bonds, it must provide the parents with fundamentally fair

procedures." *Id.* at 753-754. Here, the attempts at communication with and notice

to respondent about the proceedings, in part as a result of errors by the DHS and

the court, failed to comply with state and federal requirements and, under the

circumstances of this case, denied respondent minimal procedural due process.

Because his substantial rights were affected, the Court of Appeals correctly

remanded this case in order to give respondent "a fair opportunity to participate."

*In re Rood,* slip op at 5.

## FACTS AND PROCEEDINGS

This case concerns respondent's daughter, A., who was born out of

wedlock to respondent and Laurie Kops on April 16, 2004.[1] Their relationship

ended when A. was about one year old. After that, respondent only had sporadic

contact with A. Respondent last saw A. in December 2005, when he went to

Kops's home to celebrate Christmas with A. At that time, he and Kops had an

---

[1] Respondent executed an affidavit acknowledging paternity. The affidavit of paternity does not appear in the record, but presumably respondent acknowledged parentage under MCL 722.1003(1), which provides: "If a child is born out of wedlock, a man is considered to be the natural father of that child if the man joins with the mother of the child and acknowledges that child as his child by completing a form that is an acknowledgment of parentage." Such an acknowledgment "establishes paternity, and . . . may be the basis for court ordered child support, custody, or parenting time . . . ." MCL 722.1004. Accordingly, respondent's status is that of a legal, not a putative, father.

2

argument that culminated in a domestic violence charge against him.[2] He testified that he no longer saw A. because, after that event, he was ordered to have no contact with Kops.[3]

On March 21, 2006, the Mason County DHS placed A. in foster care after confirming reports that Kops had not been caring for A. but had left all three of her children with friends without making provisions for their care. Kops's whereabouts were unknown. The Child Protective Services worker for the DHS knew that respondent was A.'s father and understood that respondent was in the Mason County jail on the day the DHS took protective custody of A. The record reflects—and the parties do not dispute—that A.'s placement with the state following removal was designated for federal funding under subchapter IV, part E, of the United States Social Security Act, 42 USC 670 *et seq.* (Title IV-E). Accordingly, as we will explain in detail, federal law governing child protective proceedings is directly implicated as the case is subject to federal audit and review.

Respondent confirmed that he had been jailed for the domestic violence conviction that stemmed from the Christmas 2005 incident. He pleaded guilty on

---

[2] A police report dated December 27, 2005, reflects Kops's claims that respondent verbally and physically abused her, causing injury, on December 25, 2005. Respondent denied Kops's version of events, but pleaded guilty of domestic violence, second offense, MCL 750.81(3), and was sentenced to time served.

[3] He later admitted that a prior no contact order was already in place at this time; he had violated this prior order on Christmas in order to see A.

March 14, 2006, and, after being sentenced to time served, he was released from jail around the same time that A. was removed to foster care. The day after his release, Kops called to inform him that A. was in DHS custody. On March 23, 2006, he telephoned the DHS and informed Child Protective Services worker Susan Straley that he had been released from jail. Straley had not previously attempted to contact him. He testified that he told her he wished to have A. placed with him but Straley told him "they looked to place the child back with the mother not the father[]."[4] Straley told respondent that he could call the DHS to set up visits with A. Respondent testified that, in light of Kops's history of denying him access to A., he did not wish to set up visits and risk seeing her over a brief period and then never seeing her again if she was placed back in Kops's care. He did not "think any kid should be put through a push and pull with their parents." He further testified that Straley did not tell him that the DHS would create a parent/agency treatment plan and service agreement (service plan) to provide services to A.'s parents in an attempt to reunify her with her family.

Respondent testified that he gave Straley his cell phone number, the cell phone number of his girlfriend, Corinna Marshall,[5] and their address on Manistee Street in Manistee, Michigan. Straley then gave him the name and phone number

---

[4] Straley denied telling respondent that the DHS would place A. only with her mother. She testified that, although the DHS does generally try to reunify a child with the custodial parent, she did not recall telling respondent that the DHS only worked toward reunification with *mothers,* as opposed to fathers.

[5] Straley attested that respondent gave her only one cell phone number.

of the DHS foster care worker who would take over the case on March 30, 2006, Leasa Patterson. Straley also furnished respondent's phone number and Manistee Street address to Patterson.

On March 29, 2006, the Family Division of the Mason Circuit Court mailed a preliminary hearing notice to respondent at an incorrect address on 10th Street in Manistee. The notice was returned to the court as undeliverable on April 6, 2006. The record does not reveal why the court used the inaccurate 10th Street address.[6]

Patterson drafted an initial service plan (ISP) dated April 19, 2006, that outlined services designed to help Kops regain custody of A. The ISP erroneously stated that respondent's whereabouts were "unknown." Patterson did not try to contact respondent, despite having contact information for him. Lacking proper notice, respondent did not participate in the April 20 preliminary hearing. After the hearing, the court ordered that A. remain in the care of the DHS, that Kops receive parenting time, and that "[r]easonable efforts shall be made to preserve and reunify the family to make it possible for the child(ren) to safely return home."

The first notice respondent actually received that was mailed to his correct address advised him that a dispositional hearing involving Kops would take place

---

[6] The court record contains documents from unrelated matters, including certificates of conviction, apparently linking respondent to the 10th Street address. Respondent claims that he never lived at that address. It is not clear why this address was included on the certificates of conviction. Although various addresses are listed for respondent on the exhibits and police reports attached to the certificates, the 10th Street address is not among them.

on June 8, 2006. Respondent attended this hearing, during which Kops entered a no contest plea to the neglect allegations. Accordingly, the court retained jurisdiction over A. under MCL 712A.2(b).[7] The court did not address respondent's rights and conduct; rather, the court stated that he was not yet a respondent because no allegations had been made against him.

Respondent later testified that, until this hearing, he had not been aware that a neglect case against Kops was pending; from his conversation with Straley, he understood only that Kops had left A. with someone else and that Kops's whereabouts were unknown on the day that the DHS took protective custody. At the hearing, respondent gave the court his Manistee Street address and a cell phone number. The court told him he could obtain copies of the petition and other paperwork. According to Patterson, respondent knew he could speak with her after the hearing, but he "he got upset and stormed out of the courtroom and left."

A second dispositional hearing was held on June 29, 2006. For unknown reasons, instead of using the Manistee Street address that the court had used successfully and that respondent had again provided on June 8, the court sent

---

[7] MCL 712A.2(b)(1) confers court jurisdiction over a juvenile

[w]hose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship.

6

notice of this hearing to respondent at the 10th Street address. Thus, respondent did not appear. After the hearing, the court ordered that A. stay in the care of the DHS but that efforts would continue toward reunification with Kops. With regard to respondent, the order simply stated: "Notice is to be given to the legal/putative father(s) as required by law."

A week later, on July 6, 2006, Patterson contacted Kops to ask if Kops knew how to contact respondent. Kops told her—apparently falsely—that he was in Irons, Michigan.[8] Patterson testified that she contacted Kops because the phone number she had for respondent did not work. Patterson did not record her attempt to call respondent or the phone number she used. The updated service plan (USP) completed by Patterson for the period April 19, 2006, to July 17, 2006, however, lists the same phone number for respondent found in the April 19, 2006, ISP; the USP does not include the new phone number provided by respondent during the June 8 hearing at which Patterson was present.

Two additional dispositional/review hearings took place on September 14 and December 7, 2006. The court mailed notice of the September hearing to respondent at the incorrect 10th Street address. The court did not send any notice at all of the December hearing. On December 12, 2006, the court notified the parties that a permanency planning hearing would take place on March 1, 2007. The notice advised that the hearing "may result in further proceedings to terminate

---

[8] Respondent testified that he did not live in Irons while this case was pending.

7

parental rights." The notice was again sent to respondent at the incorrect 10th Street address and was returned to the court as undeliverable.

Patterson attempted to contact respondent on December 20, 2006, when she sent a copy of the most recent service plan and her business card to the Manistee Street address; on December 28, 2006, that mail was returned to her as undeliverable.[9] In January 2007, Patterson again asked Kops if she knew how to locate respondent; Kops replied that she did not know his whereabouts.

On January 24, 2007, Patterson filed a petition seeking to terminate the parental rights of both Kops and respondent. The petition alleged that Kops could not provide a stable home for her children and had failed to make progress under the service plan. It further alleged that respondent had contributed to A.'s unsafe and neglectful environment—and therefore that his rights should be terminated under MCL 712A.19b(3)(g)—by physically assaulting Kops in December 2005 in A.'s presence, failing to pay child support since A. was placed in foster care, failing to contact Patterson to participate in services in order to gain custody, and failing to have contact with A. after she was placed in foster care. Finally, the petition alleged that respondent's rights should be terminated under MCL

---

[9] Both respondent and Marshall testified that they lived at the Manistee Street address in a home owned by Marshall's parents but moved to an apartment on Ramsdell Street from July 2006 to June 2007 while they fixed up the home. Marshall stated that she forwarded the mail for herself and "all occupants" during that time. Marshall and respondent stated that they each continued to receive mail at the Manistee Street address as well. The parties could not explain why Patterson's December 20, 2006, mail was returned to her.

712A.19b(3)(j) because A. was likely to be harmed if placed in his home since respondent had a "criminal history and pattern of instability . . . ." The petition recounted several convictions: breaking and entering a building with intent to steal, MCL 750.110, in 1999; misdemeanor attempt to resist and obstruct an officer, MCL 750.479, in 2005; misdemeanor domestic violence, MCL 750.81(2), in 2005; and the domestic violence conviction stemming from his dispute with Kops in December 2005.

Proceedings to terminate respondent's parental rights were originally scheduled for March 22 and 23, 2007. On January 25, 2007, the court sent notice of the proceedings to respondent at the correct Manistee Street address. At the March 1, 2007, permanency planning hearing, the termination proceedings were adjourned. On May 23, 2007, respondent called Patterson and left a message for her. He testified that he had spoken to the prosecuting attorney, who advised him to contact Patterson. She returned his call on May 25. At that time he told her that he wanted custody of A. and was capable of raising her. Patterson instructed respondent to obtain counsel to represent him at the termination proceedings. The next review hearing took place on June 12, 2007. Respondent received notice of this hearing, which the court mailed to the Manistee Street address, and he appeared at the hearing. On June 14, 2007, the court appointed attorney Jeffrey Nellis to represent respondent.

The termination hearing took place on August 30 and 31, 2007. A. was just under 3½ years old at the time. At the hearing, respondent described his past

relationship with A. and his desire to raise her. He testified that, before December 2005, he spent time with A. and, when he lived with Kops, he was often the one who fed A. at night or got up with her when she cried. After his relationship with Kops ended, he requested overnight or weekend visits, but Kops generally refused. He saw A. when Kops "wanted [him] to buy something" or "needed something or wanted [him] to watch [A.] overnight" because Kops was having a party. He was concerned about A.'s living conditions and had called the police but did not know if they took any action in response to his concerns. He stated that he currently lived with Marshall, stayed out of trouble, and was the primary caregiver for Marshall's daughter, M., who was just under three years old at the time of the hearing. He testified that he stayed home, cared for M., and remodeled the house while Marshall worked.

Respondent also testified that, until he began receiving notices about the termination proceedings at his Manistee Street address, he did not know that the DHS or the court was attempting to contact him; he therefore assumed that A. had been returned to Kops and, as usual, that he would not hear from Kops until she needed something from him. He assumed that, if the children had remained in foster care and were not being reunified with Kops, the DHS or the court would have contacted him about placement with him. He admitted, however, that he had not made further efforts to contact the DHS or the court for information about the outcome of the proceedings or to set up visits with A.

The record confirms respondent's testimony that he was never ordered to pay child support, either while A. was with Kops or when she was in foster care. The prosecutor did not know why local prosecutors or the DHS had not sought support, particularly when Kops received public assistance.[10] Respondent stated that he gave Kops money after A. was first born and later bought items that Kops requested, like diapers, because otherwise Kops would spend the money on alcohol. He stated, "[I]f they wanted me to pay child support I would pay child support." He also stated, "I'll do whatever they want me to do" to get A. back. He testified that he did not have a full-time job but could pay support because Marshall was working and because he did odd jobs for Marshall's father and occasionally worked as a self-employed mechanic.

Marshall confirmed that she had lived with respondent for about 18 months, stating that while they both cared for M., respondent cared for her "mostly because he's home more" while Marshall worked. Marshall testified, "He takes care of her, he feeds her, he takes her outside, he makes sure she's bathed an[d] goes to bed on time." When asked how he had done, Marshall responded, "Excellent, my daughter loves him to death." Marshall also testified that respondent had never assaulted or abused Marshall.

---

[10] When a child receives federally supported public assistance, including Title IV-E funds, the state is required to seek child support from a noncustodial parent. 42 USC 654(4)(A)(i) and (20); 42 USC 666; 45 CFR 302.31(a)(2). To this end, Michigan law permits the DHS to seek child support from a noncustodial parent and requires the prosecuting attorney to represent the DHS in such matters. MCL 552.451b; MCL 552.454(1); MCL 722.3(2).

Respondent's counsel argued that, at a minimum, termination was premature. He requested that respondent "at least be given an opportunity to participate in services." He added that if the DHS had concerns about respondent's mental stability, it could conduct a psychological evaluation or a home study.

The prosecutor introduced testimony from DHS staff and evidence of respondent's convictions. Patterson testified that she sought termination because respondent "has a criminal record and . . . didn't make diligent enough attempts to contact [her]." She was not aware that respondent claimed to have given money and items to Kops in order to care for A. or that he was caring for another child. She admitted that, if she had been in contact with him earlier in the process, she would have ordered a home study to assess the appropriateness of placement with him.

Kops did not participate in the termination proceedings. Rather, she voluntarily relinquished her rights to A. on August 29, 2007.[11]

---

[11] The record reflects that Kops released her rights "contingent upon" the termination of respondent's rights. We have no other information concerning whether or how her "contingent" release affected the proceedings. Placing such a condition on her voluntary release creates a specter of misconduct by the state, particularly in light of the unexplained failures of the DHS and the court to follow up on their lack of contact with respondent beyond asking Kops—*who clearly did not want respondent to gain custody of A.*—if she knew where respondent was living. Indeed, because she released her rights to A. on the day before respondent's termination hearing, the record creates the impression that termination of respondent's rights was a foregone conclusion. Because a noncustodial parent has a constitutionally protected interest in his child, the state

12

The court ruled that termination of respondent's rights was appropriate under MCL 712A.19b(3)(g) and (j). Termination under subsection 3(g) is appropriate if the "parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." MCL 712A.19b(3)(g). The court ruled that termination was warranted under that subsection because of respondent's two convictions for domestic violence involving Kops and "the allegation [by the DHS] . . . that the child was present during the domestic violence." The court also observed that respondent had not paid child support since his daughter was placed in foster care, nor had he made payments under a court order requiring him to reimburse the state for services provided in A.'s case.[12] Finally, although respondent had Patterson's contact information, he had little contact with the DHS or the court. Thus, the court found "a failure to demonstrate proper motivation on behalf of [respondent] in making attempts to see his [child]." The court added: "[T]here has to be a responsibility and a burden of a parent to step forward. And, it's not the

_____

may not enter into agreements with an unfit custodial parent that may compromise the state's efforts to reunite the child with the noncustodial parent. Doing so creates a barrier to the noncustodial parent's participation in the proceedings and thus sets him up to fail at the termination hearing.

[12] The court referred to a June 14, 2007, order directing respondent to reimburse the court for attorney fees by paying $100 a month beginning July 15, 2007. It is unclear whether respondent was aware of this order. A stamp on the order reflects that a copy was mailed to him on June 15, 2007. It does not list what mailing address was used.

13

department's responsibility to . . . search him out in the way that's been suggested by counsel." Thus, the court concluded that termination was appropriate because the record showed by clear and convincing evidence that respondent's absence "during a very important developmental period makes it likely that this child would suffer emotionally if returned to the respondent's care." The court found that there was "no reasonable expectation that he would be able to provide proper care and custody within a reasonable time considering this child's age."

The court also concluded that termination was appropriate under MCL 712A.19b(3)(j), which applies when clear and convincing evidence establishes that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." The court cited respondent's criminal convictions and stated that "no one knows" if respondent had "learned his lesson" or no longer had a "propensity . . . to be involved in criminal behavior." The two domestic violence convictions, in particular, were "of a [sic] concern to the Court."

After finding grounds to terminate respondent's rights, the court declined to conclude that termination would clearly not be in A.'s best interests.[13] It observed

---

[13] At the time of the hearing, MCL 712A.19b(5) provided:

> If the court finds that there are grounds for termination of parental rights, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made, *unless the court finds that termination of parental rights to the child is clearly not in the child's best interests.* [Emphasis added.]

that A. had been in foster care for more than 18 months and that she had developed an attachment to her surrogate parents, experienced stability and continuity in care, and was "thriving." It characterized respondent as "virtually a stranger" to her and held that continuing "an uncertain and risky and long" reunification process was "to[o] risky" and not in her best interests.

On respondent's appeal, the Court of Appeals majority reversed. *In re Rood*, slip op at 5. The panel characterized respondent as "having been a less-than-ideal parent during his child's brief lifetime," but concluded that "the breakdown of communication in this case was predominantly attributable to petitioner." *Id.* at 3.[14] Although respondent "shares responsibility for this lack of communication," he made the initial effort to contact the DHS, attended the hearings for which he received notice, and provided his contact information to the DHS and the court. Therefore, "it was reasonable to expect that respondent would become involved in the child's life, provided that he received proper notice of the protective proceedings." *Id.*

Further, because the record showed that respondent was the primary caregiver for another child and appeared willing and able to provide for A., the trial court impermissibly concluded that "'there is no reasonable expectation that

---

[14] In particular, the panel observed that, "during the first several months of the dispositional phase of this case," Patterson's efforts "consisted of one phone call to respondent, which failed to connect . . . ." *In re Rood*, slip op at 2. Further, Patterson did not try to contact respondent through the mail, although she had his address, until more than five months after she had asked Kops about respondent's whereabouts in July 2006. *Id.* at 3.

15

the parent will be able to provide proper care and custody within a reasonable time . . . .'" *Id*. at 3-4, quoting MCL 712A.19b(3)(g). Similarly, although respondent has a criminal record, none of his offenses related to child abuse or neglect, and his record did not serve as clear and convincing evidence that he would continue to engage in domestic violence. Accordingly, the court's determination that there was a reasonable likelihood of harm to A. "amounted to 'essentially conjecture.'" *Id.* at 4 (citation omitted).

The panel also observed that, under MCL 712A.18f(1), (2) and (4), before a court may enter a dispositional order in a child protective proceeding, the petitioner must make reasonable efforts to rectify the problems that caused the child's removal by adopting a service plan. *Id*. at 2. The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights. *Id.*, citing *In re Fried,* 266 Mich App 535, 542; 702 NW2d 192 (2005). Because the efforts of the DHS were inadequate, and in light of the lack of notice to respondent of many of the court proceedings, the panel vacated the order terminating respondent's parental rights and remanded for "reconsideration after respondent has received an opportunity to demonstrate his ability and willingness to parent" A. *In re Rood*, slip op at 4.[15]

---

[15] In dissent, Judge Kathleen Jansen stated that respondent "took little initiative to contact petitioner, thereby demonstrating his general indifference for the life of the child." *In re Rood*, slip op at 1 (Jansen, J., dissenting). She opined that there was a "real possibility that respondent's failure to fully participate in these proceedings was not so much attributable to a lack of adequate notice as it

The DHS sought leave to appeal in this Court, and we granted leave.[16] We affirm the judgment of the Court of Appeals and remand this case to the trial court for proceedings consistent with this opinion.

## STANDARD OF REVIEW

Appellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error. MCR 3.977(J); *In re Trejo Minors,* 462 Mich 341, 356; 612 NW2d 407 (2000). "We review for clear error both the court's decision that a ground for termination has

___

was to his desire to avoid contact with the child's mother." *Id*. She concluded that placing A. with respondent "would be tantamount to placing the child with an utterly disinterested stranger" and that "there was a genuine likelihood that the child would suffer from future emotional harm if placed in respondent's custody." *Id*. at 1-2.

[16] We directed the parties to address

(1) whether the Department of Human Services made adequate efforts to contact the respondent-appellee father, who had given contact information to the court at the June 8, 2006, hearing concerning the rights of the child's natural mother; (2) whether the Department of Human Services was under a legal duty, imposed by statute or court rule, to conduct a home study or to make other efforts to place the minor child with the respondent father, given the unique circumstances of this case; (3) whether the existence of any legal duty was mitigated by the respondent father's failure to contact the agency for over one year, failure to pursue visitation with his child who had been placed in foster care, or his domestic-violence convictions involving the child's mother; and (4) whether the failure of the family court to send notices of the proceedings to the correct address, or the failure of the Department of Human Services to make diligent efforts to contact the respondent father at the address and telephone number provided by him at the June 8, 2006, adjudication hearing for the respondent mother, precluded the court from terminating respondent father's parental rights. [*In re Rood*, 482 Mich 900 (2008).]

17

been proven by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interest." *In re Trejo*, 462 Mich at 356-357. "A finding is 'clearly erroneous' [if] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989) (quotation marks omitted). Whether proceedings complied with a party's right to due process presents a question of constitutional law that we review de novo. *Sidun v Wayne Co Treasurer,* 481 Mich 503, 508; 751 NW2d 453 (2008).

DISCUSSION

I. Constitutional Parental Rights

A natural parent has a fundamental liberty interest "in the care, custody, and management" of his child that is protected by the Fourteenth Amendment of the United States Constitution, *Santosky*, 455 US at 753, and by article 1, § 17, of the Michigan Constitution, see *Reist v Bay Co Circuit Judge,* 396 Mich 326, 341-342; 241 NW2d 55 (1976) (Levin, J.) (stating that parents and children have fundamental rights "in their mutual support and society"). As the United States Supreme Court stated in *Santosky*, 455 US at 753-754:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. . . . When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

18

II. Procedural Due Process

Here, the primary question presented is whether the state's actions satisfied respondent's right to procedural due process. We reviewed the most basic requirements of procedural due process in *Dow v Michigan*, 396 Mich 192, 205-206; 240 NW2d 450 (1976):

> "'The fundamental requisite of due process of law is the opportunity to be heard.' *Grannis v Ordean*, 234 US 385, 394 [34 S Ct 779; 58 L Ed 1363] (1914). The hearing must be 'at a meaningful time and in a meaningful manner.' *Armstrong v Manzo,* 380 US 545, 552 [85 S Ct 1187, 14 L Ed 2d 62] (1965)." *Goldberg v Kelly*, 397 US 254, 267; 90 S Ct 1011; 25 L Ed 2d 287 (1970).

> The "opportunity to be heard" includes the right to notice of that opportunity. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v Central Hanover Bank & Trust Co*, [339 US 306, 314; 70 S Ct 652; 94 L Ed 865 (1950)].

"Due process requires fundamental fairness, which is determined in a particular situation first by 'considering any relevant precedents and then by assessing the several interests that are at stake.'" *In re Brock*, 442 Mich 101, 111; 499 NW2d 752 (1993), quoting *Lassiter v Durham Co Dep't of Social Services,* 452 US 18, 25; 101 S Ct 2153; 68 L Ed 2d 640 (1981). Under *Mathews v Eldridge,* 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976), three factors are generally considered to determine what due process requires in a particular case:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of

additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

See also *In re Brock*, 442 Mich at 111, quoting *Mathews.*

### III. Child Protective Proceedings in Michigan

In Michigan, procedures to ensure due process to a parent facing removal of his child from the home or termination of his parental rights are set forth by statute, court rule, DHS policies and procedures, and various federal laws discussed below.

### A. Removing a Child From His Home

### 1. Michigan Statutes and Court Rules

The sections of Michigan's Probate Code of 1939 governing juveniles (the Juvenile Code), MCL 712A.1 *et seq.,* are guided by the following overarching goals:

> This chapter shall be liberally construed so that each juvenile coming within the court's jurisdiction receives the care, guidance, and control, *preferably in his or her own home*, conducive to the juvenile's welfare and the best interest of the state. If a juvenile is removed from the control of his or her parents, the juvenile shall be placed in *care as nearly as possible equivalent to the care that should have been given to the juvenile by his or her parents.* [MCL 712A.1(3) (emphasis added).]

Subchapter 3.900 of the Michigan Court Rules, which covers proceedings involving juveniles, espouses the same statutorily derived goals.[17]

---

[17] MCR 3.902(B).

Here, the court removed A. from her home, as authorized by the Juvenile Code, MCL 712A.2(b)(1), as a result of Kops's neglect. When a child is removed under § 2(b), her parents[18] are entitled to notice of the proceedings and, if they are named as respondents, to representation by an attorney. A parent whose parental rights have not been terminated, including one who is not a named respondent, must be notified of and permitted to participate in each hearing, including dispositional review hearings, permanency planning hearings, and termination proceedings.[19] Our court rules require the trial court to determine at the preliminary hearing whether the parent has been notified, and the court may adjourn the hearing to secure the presence of a parent.[20] The court must also advise a respondent parent at the respondent's first court appearance that he has a right to an attorney at each stage of the proceedings and a right to a court-appointed attorney if he is financially unable to employ an attorney on his own behalf.[21]

_____

[18] The Juvenile Code and court rules provide rights similar to those of parents for guardians and legal custodians. We omit references to guardians and legal custodians here for the sake of brevity and because only parental rights are at issue.

[19] MCL 712A.19(5)(c); MCL 712A.19a(4)(c); MCL 712A.19b(2)(c); MCR 3.921(B)(1)(a) and (d), (2)(c), and (3).

[20] MCR 3.965(B)(1).

[21] MCL 712A.17c(4) and (5); MCR 3.915(B)(1). In a child protective proceeding, the petitioner, child, respondent, and parent are parties. MCR 3.903(A)(18). "'Parent' means the mother, the father . . . , or both, of the minor." MCR 3.903(A)(17); cf. 42 USC 675(2) ("The term 'parents' means biological or adoptive parents or legal guardians, as determined by applicable State law.").

When the DHS petitions for removal of a child under MCL 712A.2(b), the court must hold a preliminary hearing or hearings and may authorize the petition "upon a showing of probable cause that 1 or more of the allegations in the petition are true and fall within the provisions of section 2(b) . . . ." MCL 712A.13a(2). The preliminary hearing is governed by MCL 712A.13a and corresponding provisions of MCR 3.965. At the hearing, if the court does not dismiss the petition for removal, it may release the child to a parent and may impose any terms and conditions necessary to protect the child's physical and mental well-being.[22] If the child is not returned to his home, "the court shall order the juvenile placed in the most family-like setting available consistent with the juvenile's needs."[23] MCL 712A.13a(10). To this end, the "court must inquire of the parent . . . regarding the identity of relatives of the child who might be available to provide care. If the father of the child has not been identified, the court must inquire of the mother regarding the identity and whereabouts of the father." MCR 3.965(B)(13). The court must permit "the juvenile's parent to have frequent parenting time" unless visits, "even if supervised, may be harmful to the juvenile." MCL 712A.13a(11).[24]

"Respondent" is not specifically defined for the purposes of child protective proceedings until the termination stage, when it generally "includes (1) the natural or adoptive mother of the child [and] (2) the father of the child . . . ." MCR 3.977(B).

[22] MCL 712A.13a(3); MCR 3.965(B)(12)(a).

[23] See also MCR 3.965(C)(2).

[24] See also MCR 3.965(C)(6)(a) ("Unless the court suspends parenting time pursuant to MCL 712A.19b(4) [because a petition to terminate parental rights has

If visits may be harmful, the court must order a psychological evaluation of, or counseling for, the child and may suspend parenting time until the evaluation or counseling takes place.[25]

Within 30 days of the child's placement, and before the court may enter an order of disposition in a proceeding under § 2(b), the petitioning agency—here the DHS[26]—must provide an initial service plan.[27] The agency must report what efforts were made and what services were provided, if any, to prevent removal or to rectify the conditions that caused removal.[28] The child's continued placement must be "in the most family-like setting available and in as close proximity to the child's parents' home as is consistent with the child's best interests and special needs." MCL 712A.18f(3). As part of the ISP, the agency is statutorily required to "identify, locate, and consult with relatives to determine placement with a fit and appropriate relative who would meet the child's developmental, emotional,

---

been filed], . . . the court must permit *each parent* frequent parenting time . . . unless parenting time, even if supervised, may be harmful to the child.") (emphasis added).

[25] MCL 712A.13a(11).

[26] As applied to this case, the "agency" is the "public or private organization, institution, or facility . . . that is responsible under court order or contractual arrangement for a juvenile's care and supervision." MCL 712A.13a(1)(a); see also MCR 3.903(C)(1).

[27] MCL 712A.13a(8)(a); MCL 712A.18f(2) and (4); MCR 3.965(E)(1).

[28] MCL 712A.18f(1); MCR 3.965(D)(1).

and physical needs as an alternative to foster care." MCL 722.954a(2).[29] The ISP also must detail the efforts to be made and services to be offered to facilitate the child's return to his home or other permanent placement and a schedule for "regular and frequent parenting time between the child and his or her parent" unless parenting time would be harmful to the child. MCL 712A.18f(3) and (4).

## 2. The Childrens Foster Care Manual

State and federal law require the DHS to promulgate rules, policies, and instructions to carry out the statutory mandates.[30] The DHS Childrens Foster Care Manual (which the agency refers to as the "CFF")[31] guides the creation and implementation of a service plan, as required by 42 USC 671(a)(16) and 42 USC 675(1). Consistently with the statutory directives, the DHS "**requires** the

---

[29] Indeed, the court rules explicitly require that, at the preliminary hearing, the court "shall direct" the agency to identify and consult with relatives pursuant to MCL 722.954a(2). MCR 3.965(E).

[30] 45 CFR 1356.21(g); MCL 722.111 to 711.128; cf. MCL 712A.13a(8).

[31] The CFF is available online at <http://www.mfia.state.mi.us/olmweb/ex/html/> (accessed March 18, 2009). Only the current version is available and, although the CFF is quoted in briefs in this case, the parties have not provided the Court with the version of the CFF in effect during the proceedings in this case. Although the CFF has not been subjected to the requisite notice and comment period, which is required before such manuals are afforded deference by Michigan courts, it is nonetheless consistent with the statutes in effect during the proceedings and provides helpful insight into the procedures that the DHS requires employees to complete in practice to fulfill the statutory requirements. Further, the up-to-date version may be helpful for courts and parties faced in the future with challenges like the ones presented by this case. But, contrary to Justice Young's contention, *post* at 6, we do not fault DHS staff for failing to comply with explicit provisions of the CFF that were not in effect or not central to fulfilling the statutory mandates during the pendency of this case.

engagement of the family in development of the service plan," including "all parents/guardians . . . ." CFF 722-6, p 1 (emphasis in original). "Parents **must be encouraged to actively participate**," and the foster care worker must make "an attempt or efforts to identify and locate absent parents(s)/legal guardian or putative father." *Id*. at 2 (emphasis in original). "The participation of parents and members of the extended family/relative network is viewed as essential to achieving permanency and is to be actively sought." *Id*. at 3. The service plan must address "[w]hat the parent(s) . . . must do to achieve reunification" and "[w]hat the supervising agency must do to support parental objectives." *Id*. The foster care worker must meet with "each parent" face-to-face in the parent's home and by phone at specified intervals during the pendency of the child's placement in foster care. *Id*. at 5-6. The agency also "**must** use parenting time to maintain and strengthen the relationship between parent and child." *Id*. at 7 (emphasis in original). "Parenting time must be provided for every parent with a legal right to the child, regardless of prior custody." *Id*.

With regard to the services offered to parents, the CFF explicitly advises: "It is only when timely and intensive services are provided to families that agencies and courts can make informed decisions about parents' ability to protect and care for their children." CFF 722-6, p 11. The CFF explains that services in part underlie the "reasonable efforts" in which the DHS must engage both to avoid removal and to reunify the child with his family. *Id*. at 14, 16. "If reunification is the permanency planning goal, the court must consider whether efforts by the

25

supervising agency to reunify a family are reasonable . . . ." *Id.* at 16. "In all cases, the supervising agency's service planning must include the parent(s) (except when parental rights have been terminated) . . . ." *Id.* If a parent is "absent," the DHS must consult the Absent Parent Protocol (APP) "to ensure DHS workers . . . and the courts address the absent parent issue as early as possible in child protection proceedings." *Id.* at 17.[32]

---

[32] The current version of the APP is available at <http://courts.michigan.gov/scao/resources/standards/APP.pdf> (accessed March 18, 2009). The APP defines an absent parent as including a legal parent whose whereabouts are unknown. APP, § B(3)(b), p 5. The APP is a component of state program improvement plans (PIPs) developed in response to reviews of the state's federally funded child welfare programs. The PIPs aim to correct deficiencies cited in the United States Department of Health and Human Services Child and Family Services review (CFSR) and Title IV-E review. Noncompliant programs cause a significant loss of federal funding. See the discussion of Title IV-E funding in part IV of this opinion; *Michigan Improvement Plan (PIP) for Title IV-E Review*, Family Independence Agency, Children's Services, November 1, 2004, p 3 <http://www.michigan.gov/documents/Michiga4_123388_7.pdf> (accessed March 18, 2009); United States Department of Health and Human Services, Administration for Children & Families, *Children's Bureau Child and Family Services Reviews Fact Sheet* <http://www.acf.hhs.gov/programs/cb/cwmonitoring/recruit/cfsrfactsheet.htm> (accessed March 18, 2009); *PIP General Information* [Michigan CFSR], pp 24, 28, 32 <http://www.michigan.gov/documents/FIA-CFS-PIP-Narrative_106409_7.pdf> (accessed March 18, 2009) (noncompliance with federal CFSR requirements resulted, and APP is necessary, in part because "[f]athers were not engaged in the case planning process even when their whereabouts were known" and because "[d]iligent efforts were not made to find an absent father").

26

B.  Permanency Planning

1.  Michigan Statutes and Court Rules

The service plan must be updated every 90 days.[33]  The court generally must review the case within 182 days of the child's removal and every 91 days thereafter during the first year of placement.[34]  At each review hearing, the court must evaluate compliance with the service plan by the child's parent and the "extent of progress made toward alleviating or mitigating the conditions that caused the child to be placed in foster care . . . ."  MCL 712A.19(6) and (7).  The court may prescribe additional services or actions to be taken that are "necessary to rectify the conditions that caused the child to be placed in foster care or to remain in foster care."  MCL 712A.19(7)(a).[35]

If a child remains in foster care and parental rights have not been terminated, the court must conduct a permanency planning hearing within one year of the child's removal.[36]  Permanency planning hearings are governed by MCL 712A.19a and MCR 3.976.  Under MCL 712A.19a(2), "[r]easonable efforts to

---

[33] MCL 712A.18f(5).

[34] MCL 712A.19(3); MCR 3.966(A)(2); MCR 3.975(C).

[35] See, generally, MCR 3.973(F); MCR 3.975(A), (F), and (G).

[36] MCL 712A.19a(1); MCR 3.976(B)(2).

reunify the child and family must be made in all cases" except those involving aggravated circumstances not present here.[37]

At the permanency planning hearing, the court shall review "the progress being made toward the child's return home or to show why the child should not be placed in the permanent custody of the court." MCL 712A.19a(3). If the court determines that the "return of the child to his or her parent would not cause a substantial risk of harm to the child's life, physical health, or mental well-being, the court shall order the child returned to his or her parent." MCL 712A.19a(5). When making this determination, the court "shall view the failure of the parent to substantially comply with the terms and conditions of the case service plan . . . as evidence that return of the child to his or her parent would cause a substantial risk of harm . . . ." MCL 712A.19a(5).[38] Under the version of MCL 712A.19a in effect during the proceedings in this case, if the court determined that the child should not be returned to his parent, the court was required to order the agency to initiate proceedings to terminate parental rights unless termination was clearly not in the child's best interests. If termination was not in the child's best interests, the

---

[37] Reasonable efforts toward reunification are unnecessary if a parent caused or created an unreasonable risk of the abandonment, serious physical or sexual abuse, or death of a child. MCL 712A.19a(2)(a); MCL 722.638(1) and (2). Such efforts are also unnecessary if the parent's rights to the child's sibling were involuntarily terminated, MCL 712A.19a(2)(c), or if the parent was convicted of felony assault resulting in injury or of committing or aiding in the murder, attempted murder, or voluntary manslaughter of the child or the child's sibling, MCL 712A.19a(2)(b). See also MCR 3.976(B)(1).

[38] See also MCR 3.976(E)(1).

court could consider alternative permanent placement, including ongoing foster care.[39]

## 2. The Childrens Foster Care Manual

The CFF notes that reunification is normally "directed toward the home from which the child was removed" but, "where indicated, the focus may shift to the non-custodial parent's home." CFF 722-7, p 2. The current CFF requires the foster care worker to complete family assessment/reassessment of needs and strengths forms "to evaluate the presenting needs and strengths *of each household with a legal right to the child(ren)*." CFF 722.8a, p 1 (emphasis added). But if a parent is "unable to be located, is incarcerated for more than two (2) years or refuses to participate, an assessment does not have to be completed." *Id*. To this end, the worker is required to document that he

> completed a diligent search for parent(s) with a legal right to the child(ren) through such things as statewide [Client Information Management System] inquiry, Secretary of State inquiry, search of telephone books, US Post Office address search, follow up on leads provided by friends and relatives, legal publication, etc. and has been unable to locate. The parent(s) has not respond [sic] to mailings from the worker. [*Id*. at 6.]

---

[39] MCL 712A.19a(6) and (7); MCR 3.976(E)(2) and (3). Significantly, effective July 11, 2008, termination proceedings are no longer required if the "state has not provided the child's family, consistent with the time period in the case service plan, with the services the state considers necessary for the child's safe return to his or her home, if reasonable efforts are required." MCL 712A.19a(6)(c), as amended by 2008 PA 200.

C. Termination of Parental Rights

If the case proceeds to a termination hearing, MCL 712A.19b and MCR 3.977 provide that the court may terminate a parent's rights to his child if the court finds by clear and convincing evidence that one or more of the statutory criteria are met.[40] If, as here, termination is sought under a supplemental petition,[41] the court considers legally admissible evidence and must state its findings of fact and conclusions of law.[42] At the time of the hearing in this case, MCL 712A.19b(5) provided that if the court found grounds for termination, "the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made, *unless the court finds that termination of parental rights to the child is clearly not in the child's best interests*." (Emphasis added.)[43]

---

[40] MCL 712A.19b(3); MCR 3.977(F); see also *Santosky,* 455 US at 769.

[41] A supplemental petition "seeks to terminate the parental rights of a respondent over a child already within the jurisdiction of the court on the basis of one or more circumstances new or different from the offense that led the court to take jurisdiction." MCR 3.977(F).

[42] MCL 712A.19b(1); MCR 3.977(F)(1).

[43] Effective July 11, 2008, MCL 712A.19b(5), as amended by 2008 PA 199, now provides: "If the court finds that there are grounds for termination of parental rights *and that termination of parental rights is in the child's best interests*, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." (Emphasis added.)

IV. Federal Law

The processes for removing a child from his home and terminating a parent's rights are also governed by federal statutes and regulations. Title IV-E establishes federal funding to support state foster care systems and conditions funding on compliance with federal requirements.[44] The record reflects—and the parties do not dispute—that A.'s placement was designated for Title IV-E funding. Title IV-E requirements are significant in states, including Michigan, that rely on federal funding to support child welfare programs. Because we choose to accept federal funding, noncompliance with the federal scheme results in substantial funding losses and financial penalties.[45] Accordingly, in order to comply with

---

[44] 45 CFR 1356.21; 45 CFR 1356.50; see, generally, 42 USC 670; 42 USC 671. Title IV-E was substantially enacted and revised by the Adoption and Safe Families Act of 1997 (ASFA), PL 105-89, 111 Stat 2115. The Fostering Connections to Success and Increasing Adoptions Act of 2008, which was enacted after the relevant proceedings in this case, provides additional financial support for adoptions and kinship guardianships and requires additional efforts by states to notify and work with the extended families of children who have been removed from their homes as a result of abuse or neglect. PL 110-351, §§ 101, 103, 122 Stat 3950-3953, 3956.

[45] The federal statutes referred to in this opinion, with some exceptions, e.g., 42 USC 674(d)(3)(A), were enacted pursuant to Congress's spending power, US Const, art I, § 8, cl 1. As a result, because the rules set forth in these statutes are not "unrelated 'to the federal interest'" in these statutes, *South Dakota v Dole*, 483 US 203, 207; 107 S Ct 2793; 97 L Ed 2d 171 (1987), the state must comply with these rules in order to accept funding under these statutes. As indicated in n 32 of this opinion, states are reviewed for compliance with federal requirements. See also 45 CFR 1356.71. When a state is found not to be in substantial compliance, a portion of its federal funding is "disallowed" and must be repaid to the federal government with interest, 45 CFR 1356.71(h) and (j), and the state may be assessed financial penalties, 45 CFR 1356.86. The executive branch, acting through the DHS, is empowered by the Michigan Constitution to accept federal

31

federal requirements, our Legislature enacts and amends state statutes to mirror the federal scheme[46] and now provides that Title IV-E prevails to any extent that it conflicts with state law. 2008 PA 248, § 559.[47] Federal requirements are also clearly reflected by the DHS policies discussed earlier.

---

aid in order to help finance or execute its statutorily defined functions. Article 3, § 5, of the 1963 Michigan Constitution provides:

> Subject to provisions of general law, this state or any political subdivision thereof, any governmental authority or any combination thereof may enter into agreements for the performance, financing or execution of their respective functions, with any one or more of the other states, the United States, the Dominion of Canada, or any political subdivision thereof unless otherwise provided in this constitution.

Because one of the DHS's undisputed "functions" is the protection of children, the DHS has properly entered into an agreement with the federal government to accept the funding at issue here.

[46] As just one example of the many parallel provisions, which are generally evident from our discussion, the Legislature amended MCL 712A.19a in 2004 and 2008 to more closely resemble the comparable federal provisions. 2008 PA 200; 2004 PA 473. Most recently, for instance, as is relevant to cases like this one, 2008 PA 200 added subsection 6(c) to that statute to provide, consistently with 42 USC 675(5)(E)(iii) and 45 CFR 1356.21(i)(2)(iii), that a court is not required to terminate parental rights if the "state has not provided the child's family, consistent with the time period in the case service plan, with the services the state considers necessary for the child's safe return to his or her home, if reasonable effort's are required."

[47] 2008 PA 248 is the current DHS appropriations act and provides: "If a conflict arises between the provisions of state law, department rules, or department policy, and the provisions of title IV-E, the provisions of title IV-E prevail." Accordingly, the Legislature has consistently required the DHS to report any conflicts with federal regulations, the results of CFSR and Title IV-E foster care eligibility reviews (which measure compliance with the ASFA), and changes in DHS policy, court forms, and court rules to meet the relevant statutory requirements. See 2008 PA 248, §§ 215, 271, and 272 and the appropriations act in effect during these proceedings, 2005 PA 147. We note that we have not

32

The federal provisions most applicable here include the requirement that, under most circumstances, states must make "reasonable efforts . . . to preserve and unify families" in order both to prevent a child's removal from his home and to make it possible for the child to safely return to his home. 42 USC 671(a)(15)(B). Further, states must "consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards[.]" 42 USC 671(a)(19). For each child in foster care, the state's case service plan must include, among other things, "services . . . to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child . . . ." 42 USC 675(1)(B); see also 42 USC 671(a)(16). The state must also maintain a "case review system," in part to ensure that each child's service plan is "designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child . . . ." 42 USC 675(5)(A); see also 42 USC 671(a)(16). The case review system also must ensure that procedural safeguards are in place "with respect to parental rights pertaining to the removal of the child from the home of his parents, to a change in the child's placement, and to any determination affecting visitation

_____

discovered any conflicts between the state and federal requirements applicable to this case.

privileges of parents[.]" 42 USC 675(5)(C)(ii). The state must ensure that appropriate services are provided. As is now reflected by the recent amendment of MCL 712A.19a(6)(c) by 2008 PA 200, a court is not required to terminate parental rights if "the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to the child's home." 42 USC 675(5)(E)(iii); see also 45 CFR 1356.21(i)(2)(iii).

The Code of Federal Regulations fleshes out these requirements. Perhaps most significantly, 45 CFR 1356.21(b) provides, in part:

> The State must make reasonable efforts to maintain the family unit and prevent the unnecessary removal of a child from his/her home, as long as the child's safety is assured [and] to effect the safe reunification of the child and family (if temporary out-of-home placement is necessary to ensure the immediate safety of the child) . . . .

Further, 45 CFR 1356.21(g), mirrored by MCL 712A.18f(3), prescribes in subsection 1 that a case service plan must be "developed jointly with the parent(s) or guardian of the child in foster care," in subsection 3 that it must "[i]nclude a discussion of how the case plan is designed to achieve a safe placement for the child in the least restrictive (most family-like) setting available and in close proximity to the home of the parent(s) when the case plan goal is reunification," and in subsection 4 that it must "[i]nclude a description of the services offered and

34

provided to prevent removal of the child from the home and to reunify the family . . . ."[48]

Finally, we respond to Justice Young's contention that we "advance a novel interpretation of federal law" by concluding that the federal scheme conveys substantive rights. *Post* at 4-6. First, as a partial aside, we disagree with his implication that this Court may not address an unresolved question of federal law when that question bears on the outcome of a case under our jurisdiction. We are not precluded from deciding an issue merely because federal circuits disagree and the United States Supreme Court has yet to resolve a conflict among the circuits. See *post* at 4-5. Most significantly, however, Justice Young's discussion of substantive rights creating private rights of action under 42 USC 1983 does not bear on this case, in which respondent does not seek to enforce a federal statutory

---

[48] We note that the DHS and Governor Jennifer Granholm entered into a settlement agreement stemming from a class action lawsuit in federal district court alleging deficiencies in Michigan child welfare practices. *Dwayne B v Granholm,* Case No 2:06-CV-13548 (ED Mich), filed August 8, 2006. The text of the settlement is available at <http://www.michigan.gov/documents/dhs/DHS-LegalPolicy-ChildWelfareReform-Settlement_243876_7.pdf> (accessed March 18, 2009). Notably, the settlement is guided in part by the following principle: "The ideal place for children is in their own home with their own family. When DHS cannot ensure their safety in the family home, it must place children in the most family-like and least restrictive setting required to meet their unique needs . . . ." Settlement, § II.D, p 3. The section of the settlement pertaining to service plans requires that "[i]f the parent(s) and/or child(ren) are not available or decline to sign the plan, the service plan shall include an explanation of the steps taken to involve them and shall identify any follow-up actions to be taken to secure their participation in services." Settlement, § VII.A, p 20. The agreement is not directly relevant to the case before us, however; it resulted from the alleged failure of the DHS to comply with applicable laws and was entered by the federal district court on October 24, 2008, after the relevant events in this case.

35

provision by way of a private civil rights action. Rather, respondent claims procedural error rooted in the state's failure to comply with the state and federal processes *mandated* for termination cases. Thus, we do not conclude that the federal statutes create substantive rights; we need not weigh in on this question. The underlying substantive right at stake is not in question; it is respondent's constitutionally protected right to the care and custody of his child. Rather, we hold that respondent may certainly claim procedural error in an action brought by the state to terminate this right if the state fails to comply with the required procedures and its failure may be said to have affected the outcome of the case.

## V. Application to This Case

### A. Facts

Here, compliance with the relevant laws and regulations was sorely lacking with regard to respondent. Beginning with the preliminary hearing, the court is required to "direct" the DHS to identify and consult with relatives, MCR 3.965(E), consistent with the statutory mandate in MCL 722.954a(2). It must also determine whether "the parent . . . has been notified"; the hearing may proceed in the absence of the parent if the parent was notified or if a "reasonable attempt to give notice was made." MCR 3.965(B)(1). In this case, the order following the preliminary hearing reflected only the court's opaque determination that notice "was given as required by law." The record does not reflect that the court directed the DHS to

identify relatives or made any findings with regard to whether reasonable attempts were made to notify respondent.

Next, before the August 2007 termination hearing, the court held six hearings, beginning with the preliminary hearing on April 20, 2006, and ending with the permanency planning hearing on March 1, 2007. Notice was sent to respondent's current address for only *one* of these six hearings: the June 8, 2006, dispositional hearing. Yet respondent submitted his Manistee Street address to the DHS before any of the hearings took place. Further, he again provided this address to the court on June 8, but the court continued to use the inaccurate 10th Street address. Although at least two of the court's notices by mail to the 10th Street address were returned as undeliverable, there is no evidence of follow-up measures to locate a correct address. To the extent that the DHS was responsible for updating respondent's information, the DHS had respondent's correct address on file and the court used this address *successfully* in June 2006. Yet the court reverted without explanation to the 10th Street address and, at least until December 2006, Patterson concluded that respondent's whereabouts were unknown on the basis of a single phone call to Kops, from whom respondent was estranged and who apparently hoped to prevent contact between A. and respondent.

With regard to the efforts of the DHS to involve respondent, the ISP Patterson prepared for the April 20, 2006, hearing reflected respondent's correct address and his status as A.'s father, but stated that he was "unwilling" to

participate in the service plan. Yet the ISP also confirms Patterson's testimony that she did not contact respondent before the preliminary hearing and had no information about his household. Each subsequent updated service plan and report to the court similarly stated that respondent was "unwilling" or "refused" to participate. The USPs also reflected that Patterson did not complete a family assessment form to evaluate the needs and strengths of respondent's household, presumably because she characterized him as refusing to participate.[49] The USPs consistently reflected that Patterson had no contact with respondent. They did not detail efforts to contact him beyond Patterson's unfruitful calls to Kops in July 2006 and January 2007.[50] The USP sections on "Kinship Resources and Placement" simply stated that efforts were not made to obtain a placement with relatives because "[t]here are no appropriate relatives . . . ."

---

[49] The USPs reflected that Patterson assessed Kops's household; the assessment sections pertaining to respondent's household were left blank. At trial, Patterson testified that, if she had been in contact with respondent earlier in the process, she would have ordered a home study to assess the appropriateness of placement with him. Thus, the forms and practices of the DHS while this case was pending appear consistent with the current CFF, which states that a family assessment form "to evaluate the presenting needs and strength of each household with a legal right to the child(ren)" must be completed unless a parent "refuses to participate . . . ." CFF 722-8a, p 1.

[50] Somewhat disturbingly, the USP for the period January 16, 2007, to April 16, 2007, appears to reflect a fictional in-person contact between Patterson and respondent on January 16, 2007. Following this entry in the contact log, Patterson wrote, "Mr. Rood is not participating in services so this worker has not had contact with him but I am required to enter something to complete my report."

B.  The State Did Not Provide Adequate Procedural Due Process

In light of these facts, we find this Court's opinion in *Sidun* and the United States Supreme Court's decision in *Jones v Flowers,* 547 US 220; 126 S Ct 1708; 164 L Ed 2d 415 (2006), instructive.  Each case involved the due process rights of real property owners whose property was foreclosed by the state.  In both cases, as here, the state's attempts at notice by mail were returned unclaimed.  When notice is returned unclaimed,

> the adequacy of the government's efforts will be evaluated in light of the actions it takes after it learns that its attempt at notice has failed. . . . "[W]hen mailed notice of a tax sale is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so."  [*Sidun,* 481 Mich at 511, quoting *Jones,* 547 US at 225.]

In *Sidun,* the county treasurer's follow-up measures were insufficient when notice mailed to one address was returned unclaimed and the treasurer failed to attempt to contact the owner at a second address recorded on the deed in the treasurer's possession.  *Sidun*, 481 Mich at 513-515.  Because the treasurer had the owner's "address at hand but failed to mail notice to her at that address," the treasurer failed to afford her "minimal due process."  *Id.* at 515.

Similarly here, the court and the DHS had respondent's Manistee Street address on hand from the time proceedings began in March 2006.  There is no excuse for their failure to use this address, particularly before December 2006, when Patterson's mail addressed to Manistee Street was returned for unknown reasons.  Indeed, to some extent this failure is even more egregious than the one in

39

*Sidun*, in which it was less obvious that the second address on the deed belonged to the owner in question. *Id*. at 513-514. Here, the court and the DHS were aware that the address was both that of respondent *and* up-to-date, since he provided it in March and June 2006 and the court used it successfully to notify respondent of the June 8, 2006, hearing. Although this case does not involve a proceeding against property, the holdings of *Jones* and *Sidun* are instructive in a proceeding involving parental rights. As the United States Supreme Court has held, a parent's interest in his child "is an interest far more precious than any property right." *Santosky*, 455 US at 758.

## C. The Trial Court Clearly Erred

The trial court excused the failures of notice and communication by noting respondent's failure to contact the DHS or the court after his initial call to Patterson on March 23, 2006, or after he attended the June 8, 2006, hearing. The court refused to credit respondent's testimony that, when he did not hear from the court or the DHS after March 23, he assumed that A. had been returned to Kops; rather, the court "assum[ed] he was under the impression that [A. was] still in foster care." The court also did not credit respondent's claim that he declined to seek visits with A. because he feared bouncing in and out of A.'s life. Rather, the court concluded that respondent simply wished to avoid liability for child support payments.

We conclude that the trial court clearly erred by ruling that respondent was sufficiently responsible for his own lack of participation to excuse the state's

40

failures to inform him of the ongoing proceedings. First, although respondent was generally aware of A.'s initial placement in foster care and Kops's admission of neglect, his stated assumption that A. had been or would be returned to Kops was reasonable—and, indeed, was correct—until he was successfully notified in January 2007 of the termination proceedings; until that time, the express goal of the proceedings was reunification *with Kops*. Second, although the court correctly concluded that respondent never formally paid child support, he was also never ordered to pay child support. Significantly, the state was obligated to pursue support from him without regard to whether he visited A.[51] Therefore, he could not avoid his support obligation by simply deciding to forgo visitation. Similarly, no evidence was presented to contradict his claim that he provided Kops with items such as diapers when she asked for them. Rather, the record confirms respondent's alleged reason for refusing to give Kops money, which was that she had an ongoing history of drug and alcohol abuse. We acknowledge that, under the clear error standard, "regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR

---

[51] As previously noted, neither the DHS nor the prosecutor fulfilled the state's duty to pursue respondent for support, either when Kops received public support for A. or when A. was placed in foster care and became eligible for Title IV-E funds. Thus the court may have overstated respondent's culpability in failing to pay support, given that he was never ordered to do so and otherwise testified that he had provided Kops with support and purchased items from time to time.

2.613(C).[52] But under these circumstances, we are "left with the definite and firm conviction that a mistake has been made." *In re Miller*, 433 Mich at 337 (quotation marks omitted). The court's finding that respondent continued to avoid contact with his child merely to avoid paying child support was based on respondent's admission that, at some time in the past, Kops had insisted that she control his visitation schedule with A. and that, if he did not comply, she would pursue support. Thus, there is some evidence in the record to support the court's finding. But this isolated statement is a thin reed on which to base the overarching conclusion that respondent chose not to visit A. while in foster care merely to avoid paying support. As noted, respondent could, and should, have been ordered to pay support at any time during A.'s stay in foster care; he could not have avoided support by choosing not to visit her. Moreover, his willingness to care for A. *if* Kops were out of the picture is evident from his requests of the DHS and the court to place A. with him.

Significantly, respondent's willful absence from A.'s life and failure to voluntarily offer monetary support—even while A. was in foster care and even if to avoid Kops—is not automatic grounds for termination. Rather, his lack of contact and support is evidence of neglect. As A.'s natural and legal parent, although this neglect suggests that respondent was not a "model parent[],"

---

[52] MCR 3.902(A) specifically provides that MCR 2.613 applies in child protective proceedings.

*Santosky*, 455 US at 753, he is still entitled to notice and meaningful participation in a process affecting his parental rights.

Accordingly, it is crucial that, although respondent had actual notice of A.'s removal after the fact and received notice of one dispositional proceeding, respondent received no notice of the ongoing proceedings, the services and evaluations available from the DHS, or the fact that his parental rights could be at stake in a neglect case *against Kops.* In other words, although he had actual notice of A.'s removal and the allegations against Kops, by no means did he receive actual notice of the full nature and import of the proceedings with regard to his own rights. Subsequent notice of the termination petition and the appointment of counsel are insufficient to afford due process when *respondent's rights were terminated in part because he had not participated in the earlier proceedings* and when the trial court refused to adjourn in order for respondent to meaningfully participate in services and be evaluated as an appropriate caregiver for A. The state cannot fail to make reasonable attempts to provide adequate notice of earlier proceedings and their consequences and then terminate a parent's rights on the basis of circumstances that could have been significantly affected by those proceedings.

Further, it is for this reason that the trial court erred when it excused the court's failures of notice on the basis of respondent's lack of contact with the court and the DHS. Even if respondent willfully failed to follow up with the DHS or the court *in the neglect proceeding against Kops*, he did not effectively forfeit his

constitutional parental rights at a later termination proceeding *against him* by doing so. As explained earlier, his failure to seek visits with A. or to voluntarily provide monetary support during the proceedings was certainly additional evidence of his own neglect of his daughter. But a showing of neglect, alone, merely triggers a parent's right to participate in services. It does not automatically justify termination. As expressed in MCL 712A.19b(3)(g), when a parent fails "to provide proper care or custody for the child," termination is not appropriate unless "there is [also] no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." Because respondent was neither informed about nor properly offered the evaluation and services available to aid the court in making the latter determination, his rights could not be terminated merely because of his failure to provide care and custody.

### D. The Errors Affected Respondent's Substantial Rights

Thus, the state's failures of notice directly affected respondent's substantial rights because his lack of participation in the earlier proceedings and service plans prevented the court from meaningfully considering whether respondent could become capable of caring for his child within a reasonable time. Although he was certainly neglectful, in light of his lack of notice, his failure to participate did not constitute a waiver of his constitutional parental rights, as the trial court essentially concluded. Full notice not only would have created the opportunity for respondent to *meaningfully* participate or decline participation in services, but would have

allowed the DHS and the court to gather other facts necessary to the court's termination decision. For instance, with regard to support, not only was respondent never pursued for a monetary contribution, but Patterson admitted that, because she had no contact with him, she had no opportunity to learn or verify that he provided A. with items such as diapers. Perhaps most significantly, the court found termination appropriate under § 19b(3)(g) in part because it concluded that, in light of respondent's prior absence in A.'s life, A. "would suffer emotionally if returned to the respondent's care." Yet respondent had not been entirely absent from A.'s life; in actuality, he lived with her after her birth and she had last seen him only three months before she was removed to foster care. Assessments of respondent and services aimed at reunifying him with his daughter would have provided direct information concerning their relationship and its potential emotional harm to A. But because respondent was not evaluated, the court was left to merely assume that a relationship with respondent would be emotionally harmful to A.[53] In doing so, the court effectively punished respondent for his past

_____

[53] On this point we note that, in evaluating whether termination was contrary to A.'s best interests, the court contrasted her bond to respondent with her bond to her foster parents, opining that respondent was "virtually a stranger," whereas A. had developed an attachment to her surrogate parents and experienced stability and continuity in care. Yet on June 7, 2007—less than three months before the termination hearing—A. had been transferred from her original foster family to a second foster family. The new family appears to be the same family with which Kops left A. in 2006, so A. was somewhat familiar with them. It is worth noting that the new foster family also wishes to adopt A. and her half-sister. But the court overstated the stability of A.'s relationships while in foster care. Moreover, the court could only have reached the question whether A.'s best

45

neglect by presuming, in the state's favor, that respondent would neglect or harm

his child in the future. Thus, the court essentially relieved the state of its burden to

prove the grounds for termination by clear and convincing evidence and deprived

the second clause of MCL 712A.19b(3)(g)—which requires the state to show that,

despite past neglect, a parent could not appropriately care for his child in a

reasonable amount of time—of any meaning.[54] Employing such a presumption in

the state's favor is inappropriate when respondent was not notified of his

opportunity to be evaluated for placement and, therefore, he may not be faulted for

his failure to participate or the resulting factual gaps in the record. Indeed, in part

because respondent claimed to care for another child of similar age, assessments

---

interests were better served by her foster family *if* it had first properly found grounds to terminate respondent's rights. MCL 712A.19b(5). See also *Fritts v Krugh,* 354 Mich 97, 115; 92 NW2d 604 (1958):

> It is totally inappropriate to weigh the advantages of a foster home against the home of the natural and legal parents. Their fitness as parents and question of neglect of their children must be measured by statutory standards without reference to any particular alternative home which may be offered [to the child].

To whatever extent respondent should be considered a "stranger" to the child, his paramount rights as a natural and legal father require meaningful, independent findings concerning whether their prior lack of relationship would cause her harm, MCL 712A.19b(3)(j), or prevent him from providing "proper care and custody within a reasonable time considering the child's age," MCL 712A.19b(3)(g).

[54] We presume that a court could conceivably conclude that a parent's extended absence from his child's life would preclude reunification within a time frame appropriate to the child's age. But the court may not assume this fact under these circumstances, in which respondent's lack of prior participation was significantly attributable to the state and participation would have generated direct information on this point; the state would have conducted a professional evaluation of the child-parent relationship and its potential harm to A.

46

and services had some potential to reveal that respondent could provide a safe home for A. in a reasonable amount of time.

The court also found termination appropriate under both MCL 712A.19b(3)(g) and (j) (the latter subdivision requiring a finding of a "reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent") because respondent had been convicted of felonies, including domestic abuse against Kops. Significantly, the court opined that "*no one knows*" whether respondent no longer had a "propensity . . . to be involved in criminal behavior." (Emphasis added.) Yet the only direct evidence presented on this point weighed in respondent's favor. It was undisputed that respondent had never been accused of harming a child. Further, respondent and Marshall testified that he was staying out of trouble and had never abused Marshall. He and Marshall also both testified that he successfully cared for a young child, M., on a daily basis. In light of this evidence, Patterson's failure to assess respondent's needs and strengths, including the appropriateness and safety of his household, *as she did for Kops*, deprived the court of objective information on a disputed issue crucial to the outcome.[55] *No one knew* whether respondent was likely to persist in criminal behavior because no one had evaluated him and his lifestyle. Moreover, it is significant that the

---

[55] As is helpfully stated by the current version of the CFF: "It is only when timely and intensive services are provided to families that agencies and courts can make informed decisions about parents' ability to protect and care for their children." CFF 722-6, p 11.

statutory scheme does not relieve the state of its responsibility to make reasonable efforts toward reunification with a parent merely because, as here, that parent has a history of criminal activity or violence toward adults. Reasonable efforts are unnecessary as a result of the parent's past violence or criminal behavior only if the parent caused or created an unreasonable risk of serious physical abuse, sexual abuse, or death of a child, if the parent was convicted of felony assault resulting in the injury of one of his own children, or if the parent committed murder, attempted murder, or voluntary manslaughter of one of his own children. MCL 712A.19a(2); MCL 722.638(1) and (2). Thus, the trial court again thwarted the statutory scheme by presuming that respondent was a danger to A. on the basis of his criminal history when that history did not include any of the enumerated offenses.

## E. Decision

In sum, the state deprived respondent of even minimal procedural due process by failing to adequately notify him of proceedings affecting his parental rights and then terminating his rights on the basis of his lack of participation without attempting to remedy the failure of notice. The state was aware of respondent's status as A.'s father, his correct address, his release from jail, and his interest in obtaining custody of A. The state failed to make reasonable efforts to apprise him of the ongoing proceedings after becoming aware that most of its attempts at notice and contact had failed. Although respondent had bare notice of the proceedings involving A. and that the DHS was pursuing reunification *with*

48

*Kops*, he did not receive sufficient information to meaningfully participate—or to decline to participate—in the pretermination proceedings. The failures of notice deprived respondent of his right to procedural due process when the state then terminated his parental rights in part as a result of circumstances and missing information directly attributable to respondent's lack of meaningful prior participation. Under these circumstances, respondent's subsequent notice of the termination proceedings was not sufficient or "reasonably calculated, *under all the circumstances*, to . . . afford [him] an opportunity to present [his] objections," *Mullane*, 339 US at 314 (emphasis added), in any meaningful way, given that the court refused to delay termination in order to rectify the earlier deficiencies in notice. Respondent, therefore, was denied due process because the proceedings lacked "fundamental fairness," which is required before parental rights may be terminated. *In re Brock*, 442 Mich at 111. Accordingly, the Court of Appeals properly reversed and directed the trial court to afford respondent a fair opportunity to participate.

## F. Additional Concerns

Finally, we note that we do not prohibit the courts or the DHS from *initially* focusing reunification efforts on the custodial parent, consistent with the statutory mandates that a child be placed "preferably in his or her *own* home . . . ."[56] But when unsuccessful efforts at reunification with the custodial parent cause the state

---

[56] MCL 712A.1(3) (emphasis added).

49

to reconsider the permanency plan, there is no excuse for its failure to adequately notify the noncustodial parent of his right to involvement. Because failure to participate in the service plan is an explicit factor that may justify termination,[57] a parent has a due process right to notice of his opportunity to be assessed as a potential placement for his child before the state pursues termination on grounds that might have been remedied through assessment. To this end, we note that the statutory preferences given to a child's placement in his "own home,"[58] or in "close proximity to the child's *parents' home*,"[59] may be difficult to apply in some cases because the text appears to presume that both parents reside in the same home.[60] A noncustodial parent's rights appear to be recognized by references to a

---

[57] The court "shall view the failure of the parent to substantially comply with the terms and conditions of the case service plan . . . as evidence that return of the child to his or her parent would cause a substantial risk of harm . . . ." MCL 712A.19a(5). Further, consistently with 42 USC 675(5)(E)(iii), MCL 712A.19a(6)(c) now provides that even if the court determines at a permanency planning hearing that a child should not be returned to his parent and the child has been in foster care for 15 of the preceding 22 months, the court is not required to order the agency to initiate termination proceedings if the state "has not provided the child's family, consistent with the time period in the case service plan, with the services the state considers necessary for the child's safe return to his or her home . . . ."

[58] MCL 712A.1(3).

[59] MCL 712A.18f(3) (emphasis added); see also 42 USC 675(5)(A) ("close proximity to the *parents' home*") (emphasis added).

[60] Most notably, MCL 712A.1(3) states a preference that a child remain in his "own home" when possible, but then offers guidelines for placement when the child has been "removed from the control of his or her *parents* . . . ." (Emphasis added.) 42 USC 675(1)(B) similarly displays an assumption that parents share a home by requiring that the state offer services "in order to improve the conditions in the *parents' home* [and] facilitate return of the child to his own safe home . . . ."

50

"parent" or "parents" and by the requirements that a child be placed in "the most family-like setting available"[61] and permanently reunified with his "family" if possible.[62] Yet references to a child's "own home" appear to favor the custodial parent's home. There is no reason to conclude that a parent has a diminished constitutional right to his child merely because he does not have physical custody of that child. To the contrary, *Santosky*, 455 US at 753, specifies that "*natural parents,*" not just custodial parents, have a fundamental liberty interest "in the care, custody and management of their child" and that this interest persists although they are not "model parents" and even if they "have *lost temporary custody of their child* to the State." (Emphasis added.) Therefore, our reading of the statutes must account for a noncustodial parent's rights. "Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v Gate Pharmaceuticals*, 468 Mich 1, 6; 658 NW2d 127 (2003). Accordingly, the statutory references to placement or reunification with "a parent," "parents," or "family" must be read to include noncustodial parents when appropriate. Perhaps most significantly, the mandate that "[r]easonable efforts to reunify the child and family must be made in all cases," MCL 712A.19a(2), is not fulfilled merely

---

(Emphasis added.) 42 USC 675(5)(C)(ii) likewise refers to "removal of the child from the home *of his parents* . . . ." (Emphasis added.)

[61] MCL 712A.13a(10); MCL 712A.18f(3); 42 USC 675(5)(A).

[62] MCL 712A.19a(2).

51

through efforts to reunify the child and the custodial parent. Reunification efforts may be initially directed at a custodial parent when appropriate, consistent with the statutory preferences for a child's "own home." But if these efforts are unfruitful, the state must also make reasonable efforts to reunify the child with the noncustodial parent.[63] Accordingly, unless the noncustodial parent is statutorily disqualified from becoming his child's custodian, the state must notify the noncustodial parent of his right to be evaluated as a potential placement and of his statutory right to receive services if appropriate.

## CONCLUSION

In conclusion, a parent is entitled to procedural due process if the state seeks to terminate his parental rights. The state must make reasonable efforts to notify him of the proceedings and allow him a meaningful opportunity to participate. We evaluate whether a particular parent was afforded minimal due process on a case-by-case basis. Statutory requirements, court rules, and agency policies provide an important point of departure for this inquiry. Here, the state failed to fulfill statutory mandates, which facilitate a parent's fundamental right of

---

[63] We note that the current CFF facilitates precisely this approach. It requires efforts to locate an absent parent and "**requires** the engagement" of "all parents/guardians" in developing the service plan. CFF 722-6, pp 1-2 (emphasis in original). A caseworker must meet with "each parent" and must pursue parenting time "for every parent with a legal right to the child, regardless of prior custody." *Id*. at 5-7. A family assessment/reassessment of needs and strengths must be conducted for "each household with a legal right to the child(ren)," CFF 722-8a, p 1, and, "where indicated," reunification efforts "may shift to the non-custodial parent's home." CFF 722-7, p 2.

access to his child, to place a child with his parent if possible. The state also failed to comply with statutory notice requirements, as well as requirements that the state attempt to locate, assess, and engage a nonparticipating parent. Because respondent's rights were then terminated directly and indirectly because of his uninformed lack of participation, he was deprived of minimal due process. Although the state may again seek to terminate his parental rights, it may not do so until he has been afforded a meaningful opportunity to participate.

Affirmed.

Maura D. Corrigan
Marilyn Kelly
Stephen J. Markman

S T A T E   O F   M I C H I G A N

SUPREME COURT

In re ROOD, Minor

_____

DEPARTMENT OF HUMAN SERVICES,

      Petitioner-Appellant,

v                                            No. 136849

DARROLL DONALD ROOD,

      Respondent-Appellee.

_____

CAVANAGH, J. (*concurring in part*).

I concur in the result reached by the lead opinion. The trial court's decision to terminate respondent's parental rights should be reversed because the Department of Human Services (DHS) and the trial court failed to make reasonable efforts to reunite respondent with his child and, in light of this failure, the trial court clearly erred by determining that the DHS had shown that the statutory grounds for termination were established. Contrary to the lead opinion, however, I do not think that it is necessary for this Court to determine whether the state's actions in this case also violated respondent's due process rights.

I concur with the lead opinion's holding that the DHS failed to comply with its statutory duties. The state has a duty, under MCL 712A.19a(2), to make

reasonable efforts to reunite a child and family.[1]  Reasonable efforts require that

the DHS and the trial court, at a minimum, make the active efforts towards

reunification provided for in statutes and court rules, such as those outlined in

parts III(A)(1) and (B)(1) of the lead opinion.[2]  I agree with the lead opinion's

conclusion that "compliance with the relevant laws and regulations was sorely

lacking with regard to respondent" for the reasons explained in part V(A).[3]  *Ante*

at 36.  Further, I agree that respondent's culpability did not excuse or mitigate the

state's failure to comply with its statutory duties, as discussed in part V(C).  I

---

[1] The statute provides some exceptions, but none applies here.

[2] I agree with the lead opinion's summary of the applicable state law requirements, including the requirement that the court must "advise a respondent parent at the respondent's first court appearance that he has a right to an attorney at each stage of the proceedings and a right to a court-appointed attorney if he is financially unable to employ an attorney on his own behalf." *Ante* at 21.

In addition, as observed by the lead opinion, Michigan must comply with Title IV-E of the Social Security Act, 42 USC 670 *et seq.*, because it receives federal funding through Title IV-E.  I agree with the lead opinion's statement that the procedure for termination cases is mandated by both federal and state law, including the "reasonable efforts" requirement.  See 45 CFR 1356.21(a) and (b). As a result, courts should generally read the state and federal requirements in conjunction, and a parent may "claim procedural error in an action brought by the state to terminate [his parental rights] if the state fails to comply with the required procedures" in federal law.  *Ante* at 36.  It is not necessary, however, to determine whether the federal requirements were met in this case because the state's actions so clearly failed to meet the state requirements and "we have not discovered any conflicts between the state and federal requirements applicable to this case." *Ante* at 32-33 n 47.

[3] For the reasons stated in the lead opinion, I concur with its conclusion that "statutory references to placement or reunification with 'a parent,' 'parents,' or 'family' must be read to include noncustodial parents when appropriate." *Ante* at 51.

would also hold that, when the state is required to provide notice of proceedings to parents, a reasonable effort to do so should comply with due process requirements, such as those set out in *Sidun v Wayne Co Treasurer*, 481 Mich 503; 751 NW2d 453 (2008). In this case, the failure of the trial court and the DHS to fulfill their statutory duties and make reasonable efforts to reunite respondent and his child warrants reversal of the trial court's termination of respondent's parental rights.

I also concur that the trial court clearly erred by terminating respondent's parental rights under MCL 712A.19b(3)(g) and (j), in part for the reasons explained in part V(D) of the lead opinion. The state failed to meet its burden to show that either basis for termination was present, especially taking into consideration the earlier failures of the DHS and the trial court to comply with their statutory duties.

In light of the two clear statutory bases for reversing the trial court's termination of respondent's parental rights, I do not think that it is necessary for this Court to address whether respondent's due process rights were violated. I agree that due process issues could be implicated because of the uncontested fundamental liberty interest of any parent "'in the care, custody, and management'" of his child. *Ante* at 18, quoting *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). I also agree that, in Michigan, the statutes, the court rules, DHS policy, and federal laws all set forth procedures that help ensure adequate due process protection for parents. *Ante* at 20. Nonetheless, I disagree that "the primary question presented [in this case] is whether the state's

3

actions satisfied respondent's right to procedural due process." *Ante* at 19. This case may be fully resolved on statutory grounds, and the alleged due process violations arise out of the same state actions that resulted in statutory violations. Because this Court's holding is so clearly compelled by the statutes and court rules and is, at a minimum, consistent with due process principles, I do not find it necessary to address the extent to which it is required by due process principles.

Michael F. Cavanagh

4

S T A T E   O F   M I C H I G A N

SUPREME COURT

In re ROOD, Minor.

_____

DEPARTMENT OF HUMAN SERVICES,

      Petitioner-Appellant,

v                                                                No. 136849

DARROLL DONALD ROOD,

      Respondent-Appellee.

_____

WEAVER, J. (*concurring in part*).

I agree only with the result of the lead opinion, specifically, that the Court of Appeals correctly remanded the case to give the respondent "a fair opportunity to participate." *In re Rood*, unpublished opinion per curiam of the Court of Appeals, issued June 12, 2008 (Docket No. 280597), at 5.

Further, I agree with Justice Young, *post* at 6 n 13, that because this case is resolved both substantively and procedurally on the basis of Michigan law, the lead opinion, expressing no restraint, unnecessarily attempts to resolve federal questions concerning Title IV-E of the Social Security Act, 42 USC 670 *et seq*.

                                  Elizabeth A. Weaver

STATE OF MICHIGAN

SUPREME COURT

In re ROOD, Minor.

_____

DEPARTMENT OF HUMAN SERVICES,

      Petitioner-Appellant,

v                                         No. 136849

DARROLL DONALD ROOD,

      Respondent-Appellee.

_____

YOUNG, J. (*concurring in part*).

I concur in the result reached by the lead opinion, but do so on a narrow ground: given the failed and inadequate attempts at providing respondent notice in this case, the trial court clearly erred[1] by using respondent's failure to participate in the child protective proceedings against Laurie Kops as grounds for terminating his parental rights. I concur with the following rationale from the lead opinion that supports my conclusion:

> [A]lthough respondent had actual notice of A.'s removal after the fact and received notice of one dispositional proceeding, respondent received no notice of the ongoing proceedings, the services and evaluations available from [the Department of Human

---

[1] I also concur with the lead opinion's reliance on *In re Trejo*, 462 Mich 341; 612 NW2d 407 (2000), for the proper standards of review employed in termination cases.

Services (DHS)] or the fact that his parental rights could be at stake in a neglect case *against Kops*. In other words, although he had actual notice of A.'s removal and the allegations against Kops, by no means did he receive actual notice of the full nature and import of the proceedings with regard to his own rights.[2]

As a result of the lack of adequate notice, respondent was clearly deprived of numerous statutorily required services to ensure that he could properly parent his child. Yet in terminating his parental rights, the trial court held respondent to the standard that would have applied had he actually received such services. Accordingly, I concur in the result reached in the lead opinion.

## I. Clear Error

The failure of the trial court and the DHS to provide adequate notice to respondent was the root of the trial court's erroneous ruling that petitioner had presented clear and convincing evidence in support of the grounds cited in the termination petition—respondent's criminal history and inability to provide proper care and custody within a reasonable time. Respondent was not on notice that he was statutorily entitled to services and evaluation by the DHS and, therefore, was never the subject of a DHS investigation regarding his suitability to parent A.[3] As a result, there is a "hole" in the evidence on which the trial court based its termination decision. Although there is record evidence that respondent has been convicted of various criminal offenses, the DHS was statutorily obligated to

---

[2] *Ante* at 43.

[3] See MCL 712A.18f(1), (3), and (4); MCR 3.965(D)(1).

2

investigate further to determine whether respondent could provide a safe custodial environment for A.[4] Moreover, if the trial court and the DHS had provided timely notice, there is a possibility that respondent's inability to provide proper care and custody within a reasonable time could have been rectified through services.[5]

It is equally true that the trial court clearly erred by basing the termination on respondent's failure to provide child support. Although the DHS was empowered under the statute to seek child support from respondent while A. was in foster care,[6] it failed to do so. Respondent was never asked, let alone ordered, to pay child support for A. and, therefore, was not on notice that his failure to do so could result in the termination of his parental rights.

Although I agree with the result reached by my colleagues, I must disassociate myself from the alternative rationales employed in the lead opinion that sweep well beyond the limited legal issue presented in this case. To resolve this matter, this Court need only consider whether the trial court committed clear error by terminating respondent's parental rights on the basis of his nonparticipation, prior criminal record, and failure to pay child support.

---

[4] See MCL 712A.18f.

[5] There are situations in which the DHS is not required to provide services to the parent and may seek termination at the initial dispositional hearing, including "[a]bandonment of a young child." MCL 722.638(1)(a)(*i*) and (2). A parent abandons, or "deserts," his child if he is absent for more than 91 days and has not sought custody of his child. MCL 712A.19b(3)(a)(*ii*). The petition in this case did not allege abandonment.

[6] MCL 552.451b; MCL 722.3(2).

II. Points of Departure From the Lead Opinion

One alternative rationale that I find insupportable is the lead opinion's attempt to create substantive rights in a parent from federal statutes that do nothing more than impose a duty on the state. Title IV-E of the Social Security Act, 42 USC 670 *et seq.*, was enacted under Congress's spending power[7] and provides federal funding for states that adopt a foster care plan that complies with various requirements.[8] If a state violates those requirements, it will be required to return a portion of its federal funding.[9] As noted in the lead opinion, our Legislature has enacted several statutes mirroring the federal act.[10]

The lengthy analysis of the Title IV-E requirements provided in the lead opinion would be useful background information for intracourt training purposes in an effort to bring our system into conformance with the federal law to avoid having to return federal dollars. However, the United States Supreme Court has not addressed the question of which provisions of Title IV-E might create substantive rights that might be enforced by a parent,[11] and that question has been

---

[7] US Const, art I, § 8, cl 1.

[8] 42 USC 670; 42 USC 671; 45 CFR 1356.21; 45 CFR 1356.50.

[9] 45 CFR 1356.71(h) and (j).

[10] *Ante* at 31-32.

[11] In *Suter v Artist M*, 503 US 347, 350; 112 S Ct 1360; 118 L Ed 2d 1 (1992), the United States Supreme Court determined that 42 USC 671(a)(15) did not create a private cause of action for children affected by the state's actions. Congress reacted by enacting 42 USC 1320a-2, which provides:

4

the topic of much debate among lower federal courts.[12]  Given that the provenance

for using Title IV-E to convey substantive rights is uncertain, *this* Court should not

advance a novel interpretation of federal law, especially when this case can easily

> In an action brought to enforce a provision of the Social Security Act [42 USC 301 *et seq.*], such provision is not to be deemed unenforceable because of its inclusion in a section of the Act requiring a State plan or specifying the required contents of a State plan.  This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M . . . but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that *this section is not intended to alter the holding in Suter v. Artist M that [42 USC 671(a)(15)] is not enforceable in a private right of action.* [Emphasis added.]

In the wake of Congress's enactment of § 1320a-2, the United States Supreme Court has not considered whether any provision of Title IV-E creates a private cause of action.  The Court has only held that courts must examine Title IV-*D* of the Social Security Act provision-by-provision to determine whether the challenged provision gives rise to an enforceable, individual right.  *Blessing v Freestone*, 520 US 329, 342; 117 S Ct 1353; 137 L Ed 2d 569 (1997).

[12] See *Arrington v Helms*, 438 F3d 1336, 1342-1347 (CA 11, 2006) (42 USC 675 does not create a private cause of action); *31 Foster Children v Bush*, 329 F3d 1255, 1268-1274 (CA 11, 2003) (42 USC 675[5][D] and [E] do not create private cause of action); *Johnson v Holmes*, 377 F Supp 2d 1084, 1092-1101 (D NM, 2004) (42 USC 671[a][9] does not create a private cause of action),  rev'd in part on other grounds 455 F3d 1133 (CA 10, 2006); *Carson v Heineman*, 240 FRD 456, 532-544 (D Neb, 2007) (42 USC 671[a][1], [10], [11], [15], [16], and [22], 42 USC 672, and 42 USC 675[1], [4], and [5][B], [D], and [E] do not create private causes of action); *ASW v Oregon*, 424 F3d 970, 975-979 (CA 9, 2005) (42 USC 671[a][12] and 42 USC 673[a][3] create private causes of action); *California Alliance of Child & Family Services v Allenby*, 459 F Supp 2d 919, 922-925 (ND Cal, 2006) (42 USC 675[4][A] creates a private cause of action); *Kenny A v Perdue*, 218 FRD 277, 290-294 (ND Ga, 2003) (42 USC 622[b][10], 42 USC 671[a][10], [16], and [22], and  42 USC 675[1] and [5][D]and [E] create private causes of action).

5

and entirely be resolved on narrow state law grounds.[13] Accordingly, I disagree with part IV of the lead opinion.

I also disagree with the lead opinion's extensive reliance on the *current* version of the DHS Childrens Foster Care Manual. This internal operating manual does not have the force of law, or even of an administrative rule. Moreover, this Court should not judge the conduct of the trial court and DHS workers on the basis of standards that were not imposed until after the events relevant to this case.

Finally, I disagree with the lead opinion's consideration of the potential constitutional implications of the trial court's and the DHS's statutory and court rule violations. This Court has repeatedly held that it should not decide a case on constitutional grounds if the issues can be fully and adequately resolved on statutory grounds.[14] The numerous statutory and court rule violations, and the trial

---

[13] It is the duty of the Legislature to enact statutes providing *procedural* rights consistent with Title IV-E. A parent may challenge the trial court's failure to comply with state statutes that have been enacted as part of a Title IV-E compliance plan. However, the "remedy" for the state's failure to enact statutes consistent with Title IV-E is given to the federal government in the form of "disallowing funding," not to the parent.

Contrary to the statement in the lead opinion, *ante* at 35, I do not imply that this Court lacks authority to consider questions of federal law that have yet to be decisively resolved by the federal courts when this is necessary for the resolution of a case properly before this Court. However, I do challenge the lead opinion's unnecessary and lengthy analysis of Title IV-E when this case can be entirely resolved—both substantively and procedurally—on state law grounds.

[14] See *J & J Constr Co v Bricklayers & Allied Craftsmen, Local 1,* 468 Mich 722, 734; 664 NW2d 728 (2003), citing *People v Riley*, 465 Mich 442, 447; 636 NW2d 514 (2001), and *MacLean v Michigan State Bd of Control for*

6

court's subsequent use of its own violations as grounds for terminating respondent's parental rights, are sufficiently egregious to require appellate relief. We should delve no further than the clear error analysis, which completely resolves this matter.

Robert P. Young, Jr.

Hathaway, J., did not participate in the decision of this case in order to avoid unnecessary delay to the parties in a case considered by the Court before she assumed office by following the practice of previous justices in transition and participating only in those cases for which her vote would be result-determinative.

---

*Vocational Ed*, 294 Mich 45, 50; 292 NW 662 (1940); *Delta Charter Twp v Dinolfo*, 419 Mich 253, 264 n 4; 351 NW2d 831 (1984).