# STATE OF MICHIGAN

# COURT OF APPEALS

In re J. S. M. GRASTY, Minor.

UNPUBLISHED
November 9, 2017

No. 338681
Lapeer Circuit Court
Family Division
LC No. 16-012325-NA

Before: MURRAY, P.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

The circuit court terminated respondent-mother's parental rights to her 13-month-old daughter, JG, based on her failure to follow through with and benefit from services. She challenges the adequacy of the services provided and contends that the court should have adjourned the termination hearing to allow her additional time to benefit. Respondent also argues that insufficient evidence supported the court's termination decision and that termination of her parental rights was not in the best interests of her daughter. We affirm.

## I. BACKGROUND

JG was born on April 1, 2016. Respondent was then homeless and a distant relative, Lisa Mardlin, offered mother and child temporary sanctuary in her Lapeer home. Approximately 10 days later, respondent was arrested and jailed in Sanilac County on charges of knowingly purchasing ephedrine/pseudoephedrine to make methamphetamine. Child Protective Services (CPS) intervened and respondent requested that JG remain in Mardlin's care.

On April 14, respondent entered a plea of admission to allow the court to exercise jurisdiction over the child. Respondent admitted to a history of substance abuse, mental health issues, prior terminations of her parental rights to four other children, lack of suitable housing and income, and the existence of pending criminal matters. The court ordered respondent to comply with and benefit from a treatment plan designed to address the barriers to reunification. Foster care worker Mary Bukosky indicated that after respondent was released from jail, she would be offered services that included housing assistance, random drug screens,[1] parenting

---

[1] Respondent consistently appeared for screens and remained drug-free throughout the proceedings.

-1-

classes, parenting time, and a psychological evaluation and services related to the recommendations made therein. Due to respondent's known mental health issues, respondent would also be referred for mental health counseling.

Respondent was released from jail on July 10. She then moved into her mother's home in Port Huron, St. Clair County. The Department of Health and Human Services (DHHS) referred respondent to counseling, but she requested that she be permitted to independently pursue counseling at the Professional Counseling Center (PCC) because she had received services there before and because it was close to her mother's home. Respondent also promised to seek psychological and psychiatric assistance through Community Mental Health (CMH).

Respondent's residence in a different county than her child made the delivery of services difficult, as did her failure to timely apply for Medicaid as directed by the caseworker. Respondent ultimately attended eight out of a recommended 12 counseling sessions with a therapist at PCC. The therapist found respondent anxious, angry and depressed. She focused her anger on her perception that she had been wronged by "the system" and repeatedly asserted that she did not require mental health treatment. Respondent finally acknowledged that she may need medication to overcome her issues and the therapist gave her a list of psychiatrists to choose from. Respondent failed to follow through. The therapist concluded that respondent made no progress during treatment.

A PCC family specialist, Jessica Leenkneght, provided 10 hours of intensive in-home services each month and assisted respondent in her unsuccessful efforts to find employment and a place to live. Respondent's job hunt was stymied by her lack of a driver's license and failure to follow through in securing a copy of her birth certificate. Leenkneght opined that respondent's prior felony conviction was also an obstacle.

The DHHS granted 77 supervised parenting time sessions in Lapeer. Respondent reported transportation issues and attended only 44 sessions and was late for 13. The DHHS offered to provide less frequent but longer sessions so respondent would not need to travel as often, but she declined. The visits respondent attended went well and respondent adequately addressed young JG's needs.

Respondent was arrested again on April 6, 2017 and was sentenced to serve 90 days in jail. On April 28, the DHHS filed a supplemental petition seeking termination of respondent's parental rights. Respondent was transported from jail for a two-day termination hearing. Bukosky, respondent's therapist, and Leenkneght all testified at the hearing. In addition, Mardlin testified that she has been friends with respondent for 12 years. During that time, respondent has not worked, other than providing housekeeping services at a single home. Mardlin did not believe respondent could maintain employment or could ever provide a home for JG. She expressed her desire to adopt the baby.

Bukosky testified that respondent was unable to independently provide a home for her daughter. She also could not provide a home with her parents. Respondent's mother and stepfather indicated that they would not allow respondent and her child to live in their home and they were no longer willing to provide respondent any assistance.

Finally, on the second day of the termination hearing, respondent admitted that she had mental health issues that needed to be addressed before she could regain custody of JG. She promised that she would contact CMH upon her return to the jail and would arrange for services to begin upon her release. Given an additional three months, respondent testified, she could show benefit from mental health services.

The circuit court terminated respondent's rights, finding that despite the provision of 12 months of services, respondent still lacked suitable housing and employment, and had not adequately addressed her mental health issues. Additional time would not change the outcome. Respondent repeatedly told the caseworker that she was familiar with the system and services, even selecting her own service provider. Respondent knew what was expected of her, but she demonstrated a lack of motivation and therefore could not benefit from additional services.

Respondent now appeals.

## II. REASONABLE EFFORTS

Respondent first contends that the DHHS failed to make reasonable efforts to reunify her family because it failed to reasonably accommodate her mental health issues and failed to implement services properly.

Before a court may contemplate termination of a parent's rights, the DHHS must make reasonable efforts to reunite the family. MCL 712A.19a(2). "The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009). However, a respondent also has a responsibility to participate in services offered by petitioner. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

In *In re Hicks/Brown*, 500 Mich 79; 893 NW2d 637 (2017), the Michigan Supreme Court recently considered whether the DHHS made reasonable efforts to reunify an intellectually disabled parent with her children. The Court considered obligations arising under both the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, and the Michigan Probate Code, MCL 712A.18f(3)(d). Under the Probate Code, "the Department has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *Hicks/Brown*, 500 Mich at 85. The ADA provides that " 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' " *Id.* at 86, quoting 42 USC 12132. The DHHS neglects its duty under the ADA to reasonably accommodate a disability when it fails to implement reasonable modifications to services or programs offered to a disabled parent, the Court stated. Id. Similarly, "efforts at reunification cannot be reasonable under the Probate Code if the [DHHS] has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *Id.*

There is no record indication in this case that respondent required or was entitled to accommodations in her service plan. Psychologist Thomas Seilheimer conducted respondent's psychological evaluation on September 1, 2016. Respondent self-reported "a non-specified

special education certification" during her school career and that she dropped out after the 9th grade. She also indicated that she was diagnosed with ADHD, depression and anxiety as a child. Over the years, respondent had tried Lexapro, Zoloft, Xanax, Ativan and Ritalin, but these "deliver[ed] marginal benefit." Seilheimer determined that respondent likely suffers from a mood and personality disorder. He recommended "[b]ehavioral health counseling . . . focus[ed] on depression and underlying cannabis use and personality issues." Seilheimer did not independently note any cognitive impairment that would entitle respondent to special assistance in following her case service plan. Respondent provides no legal support for any claim that her mood and personality disorders fall within the definition of a disability under the ADA.

Respondent further contends that the DHHS hindered her progress by making untimely referrals for a psychological evaluation and counseling, and in failing to make a psychiatric referral. These claims are without merit. The DHHS referred respondent for services as soon as possible. The referral was initially delayed because respondent was incarcerated for purchasing methamphetamine ingredients. Services were further delayed because respondent waited three months to follow through on the caseworker's direction to apply for Medicaid despite receiving repeated reminders. The provision of services was complicated because respondent requested psychological services from an agency with which the DHHS did not have a standing contract. And respondent's therapist did recommend a psychiatric evaluation and gave respondent the names of several doctors; respondent simply failed to follow through.

Respondent contends that the DHHS made insufficient efforts to assist her in securing suitable housing and employment. Leenkneght provided these very services. Over a period of seven months, she helped respondent fill out applications and drove her to interviews. Despite these efforts, respondent was unable to secure gainful employment. Leenkneght surmised that respondent's lack of any work experience and prior felony conviction affected her employability. But respondent also failed to follow through on acquiring copies of her birth certificate and identification that were required for some of the housing and employment applications. Finally, had respondent agreed to housing in Lapeer County, the DHHS would have had more resources available to assist her. Instead, respondent chose to stay in St. Clair County, residing briefly with her mother, then in a homeless shelter, and finally with a male friend.

Respondent complains that the DHHS did not assist her with transportation issues. Again, this assertion is unsupported by the record. Respondent was 35 but never obtained a driver's license. She had no independent transportation, but chose to live in a different county than her child. The DHHS attempted to move visitation closer to respondent. As a prerequisite to this move, the DHHS requested that respondent meet with a pastor at a church willing to host parenting time. Respondent never took this step. In an effort to reduce the number of trips to Lapeer County while maintaining the hours afforded to respondent, the DHHS offered expanded parenting time hours on fewer days. Respondent declined. Ultimately, Leenkneght assisted respondent with some of her transportation needs and respondent told Bukosky that she had friends and family willing to help her with transportation and that she could also take the train. The DHHS's efforts did not fall short.

## III. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the DHHS failed to present sufficient evidence to support the statutory grounds for termination. Pursuant to MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" that at least one statutory ground has been proven by the DHHS. MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). When termination is sought in a supplemental petition, the court's decision must be based on legally admissible evidence. *In re DMK*, 289 Mich App 246, 257; 796 NW2d 129 (2010). We review a circuit court's factual finding that a statutory termination ground has been established for clear error. *Rood*, 483 Mich at 90-91. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted). "Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

The court terminated respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j), which permit termination under the following conditions:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The DHHS removed 11-day-old JG from respondent's care when respondent was arrested and incarcerated. CPS and DHHS were familiar with respondent as her older four children had all been court wards in the past. Respondent had voluntarily relinquished her parental rights to three of the children and the court involuntarily terminated her rights to the fourth. The agencies were therefore already on notice of respondent's untreated mental health issues. At the time of her arrest, respondent was essentially homeless and had never been

employed. These same conditions made it impossible for respondent to provide proper care and custody for JG.

Respondent did not rectify these conditions by the time of the termination hearing. Respondent's therapist saw no progress as respondent refused to acknowledge that she needed treatment and did not follow through on the therapist's recommendation that she see a psychiatrist. Despite significant assistance, respondent also still had not found employment or housing. Given respondent's lackadaisical approach, it was unlikely that respondent would be able to rectify these conditions within a reasonable time. Accordingly, the circuit court's determination that termination was supportable under factors (c)(*i*) and (g) was not erroneous.

There is no evidence that JG was ever in danger in respondent's care and we decline to assume such danger on the record before us. However, the DHHS need only establish one ground to support termination and it supported two. As such, we discern no ground for reversal.

## IV. BEST INTERESTS

Respondent asserts that the circuit court erred when it found that termination of her parental rights was in JG's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *Moss*, 301 Mich App at 90. The lower court should weigh all the evidence available to it in determining the child's best interests. *Trejo*, 462 Mich at 356-357. Relevant factors include "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality. . . ." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, [and] the children's well-being while in care. . . ." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). The advantages of the child's foster placement over placement with the parent are a relevant consideration, *In re Foster*, 285 Mich App 630, 634-635; 776 NW2d 415 (2009), as well as the length of time the child has been in care, *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 64; 874 NW2d 205 (2015). "With respect to the trial court's best-interests determination, we place our focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016).

JG has been in care since she was 11 days old and has lived in the same home with her foster parents since she was released from the hospital. As a result, JG has no real bond with her mother. By all accounts, JG is well-adjusted, happy, and loved by her foster family and her foster parents wish to adopt her. Respondent only inconsistently visited with her daughter and never progressed to unsupervised parenting time. She also gained no benefit from her year of services. At the end of the year, respondent was still unable to properly parent her child or adequately provide for her child's needs. The record more than adequately supports the circuit court's best-interest determination.

Respondent suggests that the circuit court should have considered a guardianship in lieu of terminating her parental rights. However, JG was only 13 months old and a guardianship

would not provide the permanency and finality necessary to foster her continued growth and development.

## V. ADJOURNMENT

During respondent's testimony at the termination hearing, she claimed to have an epiphany. Respondent suddenly realized that her mental health issues required treatment and claimed that if she buckled down for three months, she would be able to care for her daughter. Based on this statement, respondent contends that the circuit court should have adjourned the termination hearing to give her additional time to comply with her service plan. Respondent further emphasizes that her services were delayed by three months because she was incarcerated at the beginning of the proceedings.

"Adjournments of trials or hearings in child protective proceedings should be granted only (1) for good cause, (2) after taking into consideration the best interests of the child, and (3) for as short a period of time as necessary." MCR 3.923(G). "[I]n order for a trial court to find good cause for an adjournment, 'a legally sufficient or substantial reason' must first be shown." *In re Utrera*, 281 Mich App 1, 11; 761 NW2d 253 (2008) (citation omitted).

Respondent never requested an adjournment. As such, she never presented a legally sufficient reason to grant an adjournment. Even if she had, the cited reasons would not have supported her request. The delay in starting respondent's services was of her own making. Her own actions led to her incarceration. Thereafter, respondent failed to apply for Medicaid despite being thrice asked to do so. Moreover, respondent did not benefit from nine months of services and only grasped the importance of her failure to comply with her service plan as she sat in court for the termination hearing. It was unlikely that an additional three months would have led to the necessary improvements.

We affirm.

/s/ Christopher M. Murray
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher