*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* PLUMMER, Minors.

UNPUBLISHED
December 28, 2023

No. 366380
Branch Circuit Court
Family Division
LC No. 22-006471-NA

Before: FEENEY, P.J., and RICK and HOOD, JJ.

PER CURIAM.

Respondent-father appeals as of right the order of the trial court terminating his parental rights to his minor children, KP, RP, IP, and PP, under MCL 712A.19b(3)(j) (reasonable likelihood of harm if returned to parent), and (3)(k)(*ii*) (parent abused the child or sibling by engaging in criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate). The trial court found clear and convincing evidence to support termination under these statutory grounds despite conflicting evidence that casts serious doubt on the reliability of the sexual-assault allegations underpinning this case. Its failure to address this conflicting evidence, make findings of fact, and make clear credibility determinations supporting its legal conclusions, leaves us with a definite and firm conviction that the court made a mistake. We vacate and remand for further proceedings.

## I. BACKGROUND

This termination of parental rights case started with allegations that respondent-father sexually abused KP. Respondent-father started dating KP's mother[1] when he was 22 years old and she was 16. The mother became pregnant with KP when she was 16 and was 17 when she gave birth to KP in July 2013. Two years later, in November 2015, respondent-father married KP's mother. The couple had three more children over the course of the next four years: RP in

---

[1] Though the mother was a respondent below, the trial court did not terminate her parental rights at respondent-father's termination here. She is not a party to this appeal and does not otherwise have an appeal pending before this Court.

December 2015, IP in September 2017, and PP in October 2019. All four children have varying degrees of special needs.[2]

Until August 2022, respondent-father, the mother, and their children lived in Indiana, next door to the mother's parents. In early 2020, with the onset of the COVID-19 pandemic, respondent-father quit his job to stay home with the children while the mother continued working as a nurse at a local hospital. During this time, respondent-father cared for KP and helped with her schooling, but much of his time was devoted to caring for the three youngest. KP spent almost every day at her grandparents' house, often going there after school, eating there, and bathing there before returning home around bedtime. According to respondent-father, during the summer of 2020, KP spent what "seemed like" every day at her grandparents' house, typically bathing there three or four times a week.

## A. RESPONDENT-FATHER'S CONTENTIOUS RELATIONSHIP WITH IN-LAWS

Respondent-father's relationship with his in-laws was contentious, particularly as it related to KP. For example, respondent-father testified that on July 4, 2020, he went to the grandparents' home to invite the grandmother over for dinner. At the time, she was on the phone with the grandfather, who was out of town. Respondent-father overheard the grandfather say that he wanted to ask about taking KP to see fireworks. According to respondent-father, the grandmother stated to the grandfather that respondent-father and the mother likely would not give their permission. The grandfather responded, respondent-father testified, that he knew how to speak to respondent-father and the mother to "get what [he] wanted from [them] . . . ."[3] Respondent-father characterized it as the grandfather admitting he "knew how to manipulate [the mother] and I to get his way." When respondent-father declined to allow the grandfather to take KP to the fireworks (citing short notice and the pandemic), the grandfather, still on the phone, became angry. According to respondent-father, the grandfather said: "[L]isten here you stupid little fucker, if I get home and you're still there, I'm going to pull my gun out and I will shoot [y]our ass; get the hell off my property now." Respondent-father left.

According to respondent-father, the grandfather later tried to apologize, indicating that respondent-father offended him when he rejected the grandfather's request to take KP to the fireworks. When respondent-father confronted the grandfather about his behavior and apparent

---

[2] KP, the eldest of four daughters, has anxiety, depression, ADHD, and had "recently" tested for autism around the time of the termination hearing in May 2023. According to Sarah Hobi, a foster care worker who was assigned to the case in January 2023, there was "a great likelihood" KP had autism. RP has ADHD and is nonverbal autistic. She uses a tablet with pictures to articulate her needs. IP has anger issues and "speech delays" that caused difficulty communicating, though, according to Hobi, she was in speech therapy. PP also has anger issues and speech delays. Hobi confirmed that IP and PP had behavioral problems because of their anger issues, "constantly fight[ing]," "hit[ting] each other and other children," and "run[ning] away."

[3] It is unclear from the record whether the grandmother knew of respondent-father's presence in the home at the time the grandfather made these statements, although she eventually told the grandfather to ask respondent-father about the fireworks because he was "right here . . . ."

belief that he could manipulate respondent-father and the mother, the grandfather "got mad" again. He again told respondent-father to "get the fuck off his property, so [respondent-father] went and turned." According to respondent-father, the grandfather "yelled at [him] again, came walking right up to [him], got face to face, pulled his fist back, and basically belly-bumped [respondent-father] all the way from our vehicles up to our front porch with his fist pulled back." Despite the grandfather's behavior, respondent-father continued allowing KP to visit his grandparents because, up to that point, the grandmother had not engaged in similar behavior.

The mother also described the relationship between respondent-father and her parents as "not good," stating that they "just always had animosity toward each other . . . ." The mother testified that her father, the grandfather, was "very threatening" toward respondent-father, including making a comment about shooting respondent-father. She also confirmed that her mother, KP's grandmother, had threatened to call Children's Protective Services (CPS) on the mother and respondent-father. The mother believed the grandmother was "just angry" that respondent-father had "said something about him not like wanting [KP]" to go to the grandparents' house "as often because she was acting out" and "had some behavioral issues, like acting spoiled . . . ." This led them to limit the time their children visited the grandparents. Respondent-father also testified that in April 2020, the grandfather demanded a portion of respondent-father's and the mother's tax return, COVID-19 relief payment, and food stamp cards.

## B. KP'S BEHAVIORAL CHANGES

Between the fall of 2020 and the spring of 2021, KP continued spending substantial time with her grandparents. Respondent-father testified that during this time, KP "started getting more defiant" and "challenged [him] more." KP "wouldn't listen," would say that she "hate[d]" respondent-father and could "do whatever she wants" at her grandparents' house. Respondent-father also acknowledged that KP began lying about various things, including "[s]tealing food, stealing candy, [and] homework . . . ." According to respondent-father, this is also when he started noticing KP itching or rubbing her genital areas and that she had stains in her underwear.[4] The mother denied that KP had issues with itching in her genital area. In July 2021, respondent-father took KP to a pediatric doctor because of the frequent itching. The doctor diagnosed KP with a urinary tract infection (UTI). Respondent-father testified that during this time KP had "a UTI at least once a month." Respondent-father also indicated that he observed KP touching herself inappropriately. The mother testified that she had a conversation with KP about inappropriately touching herself, indicating that although she "never specifically caught her," respondent-father "had a conversation with [the mother] about it because he was home with the children."

Respondent-father noticed that KP's behavior increasingly worsened the more time she spent with her grandparents, so he started limiting her time at their house. The longer she was away from her grandparents, he testified, "the more leveled out she would get." When they "let her go back to see" them, however, KP went "back to all these different behaviors" and being

---

[4] Respondent-father testified that although KP regularly showered at her grandparents' house, he frequently had to instruct her to "do better on [her] wiping" and cleaning herself. With respect to KP's bathing routine at home, respondent-father indicated that he prepared clothes, underwear, and a towel for KP before she showered.

"defiant . . . ." According to respondent-father, the grandmother responded to the restricted time with KP by claiming he was "attacking" and "denying" them. Respondent-father did not completely restrict KP, however. He testified that after the fireworks incident, KP "wouldn't go over" to the grandparents' house but the grandmother visited the family home. Respondent-father and the mother eventually allowed KP "to go back over" to the grandparents' house. During this time, the grandmother could still visit KP, but "there were just certain things about [the grandfather] that [respondent-father] just didn't trust."

In October 2021, respondent-father and the mother noticed KP acting inappropriately. According to respondent-father, she tried to "sit on full grown men's laps," wore dresses with "no regard for showing her underwear all the time," and found TikTok videos on her phone of her "dancing provocatively" at her grandparents' house. The mother confirmed that KP "danc[ed] inappropriately to music" on her TikTok, which led to her parents taking away her phone. The mother also confirmed that she discussed the TikTok issue with her parents because she was "very upset about it." The grandparents denied "know[ing] that she was doing it." According to respondent-father, however, "you would hear [the grandfather] or [the grandmother] yell at [KP]" in the videos.

In early 2022, KP started going back over to her grandparents' house more regularly. At first, these visits were consistent. She stayed the night some evenings but returned home on others (school nights). "As time went on," however, the grandmother would message respondent-father and say KP could not come over. These cancellations started happening more frequently, to the point KP questioned whether her grandmother still loved her. At that point, respondent-father informed the grandmother she would have to visit the family's home to see KP because he was "sick and tired" of the grandmother scheduling a visit and "canceling every single day." The grandmother "got mad, started cussing [respondent-father] out, [and] calling [him] different names." She also threatened physical violence by her and the grandfather, and to call CPS against him and the mother. Respondent-father therefore told the grandparents he would not "let [them] come over anymore," telling them to talk to the mother if they wanted to do so. At some point, the grandmother came over and "slammed her fist against the door," trying "to force the door down," and the mother had to go outside to calm down the grandmother.

## C. ALLEGATIONS OF SEXUAL ABUSE

Sometime around June or July 2022, the mother expressed concerns to respondent-father that "someone was" sexually abusing KP. Initially, when asked at the adjudication hearing whether she expressed a concern to respondent-father that her parents were sexually abusing KP, the mother stated: "Yes." She then clarified that she told respondent-father she "thought someone was" sexually abusing KP, noting that KP spent most of her time with the grandparents, the mother, and respondent-father, but that she also "often" went to a neighbor's house to play with the neighbor children.

Respondent-father confirmed that his relationship with his in-laws got so bad that he and the mother decided to move the family to Michigan. In early August 2022, they moved to Coldwater. Although the family moved to Michigan, KP continued to visit and stay with the grandparents in Indiana.

-4-

Two weeks after they moved to Michigan, the grandfather called the mother and "said [KP] wanted to tell [her] something . . . ." KP "got on the phone" and, though she did not go into specific detail, told the mother that respondent-father "touched her private parts" at their old house in Indiana and their new house in Michigan. According to the mother, KP reported that the abuse occurred at the Michigan house on the same day that they moved there. The mother had returned to Indiana for more belongings, IP and PP were still in Indiana (in daycare), and KP and RP stayed with respondent-father in Michigan. The mother confronted respondent-father, who denied the allegations.[5] The mother testified that before she made these disclosures, KP was "[v]ery outgoing and bubbly, very caring and compassionate," and "behaved well." She indicated that KP at worst had a "spoiled attitude" and would "do[] things like more mature than what she was." After KP disclosed the abuse, however, her behavior changed "tremendously," according to the mother. The mother stated that KP had "horrible behaviors now," displayed "[a] lot of aggression," had "behavioral issues," and brought up "sexual things about her sisters, about herself." The mother described it as "very aggressive" and "very just out of character for [KP]."

In mid-September 2022, CPS received a complaint alleging that respondent-father had sexually abused KP, RP, and IP. According to the mother, her parents reported the allegations to CPS. Mariah Harper, the CPS investigator for this case, recounted the details of the abuse allegations at the March 3, 2023 adjudication hearing:

> [The mother] and [respondent-father] are the parents of [KP, RP, IP, and PP]. They reside together. A month ago [the mother] and family relocated to Michigan from Indiana. [Respondent-father] has been molesting [KP, RP, and IP] for a long time, starting in Indiana and still occurring in Michigan. . . . [Respondent-father] touches and rubs [KP, RP, and IP's] private parts, and makes them also touch and rub his private parts while [the mother] is either asleep or in the bathroom. [The mother] was made aware of the abuse, but said the issue should be dropped because it is a lie. She has not put a safety plan in place to prevent further abuse.

A day after CPS received the complaint, respondent-father agreed as part of a safety plan to leave the home.

In late September 2022, Yolanda Lozano interviewed KP (nine years old at the time) at the Child Advocacy Center. Before the interview, however, Lozano received two complaints—one related to respondent-father and another related to the grandfather. Lozano's description of the allegations related to respondent-father are consistent with those described by the mother and Harper. According to Lozano, KP disclosed a recent incident during which respondent-father "inserted more than one of his fingers into her private area." When Lozano asked KP to clarify what she meant by "private area," KP was "unable to tell [Lozano] exactly what that was" but "she did point to her buttocks area." KP indicated that this incident occurred in the Michigan house and provided a specific date for the incident: August 9, 2022.[6] She reported to Lozano that, at the

---

[5] Respondent-father denied ever sexually assaulting KP or any of his other children.

[6] Lozano found that KP was "being pretty specific, especially when she gave me an exact day and she was able to give me an exact location, who was there, what else was going on during that day."

time, the mother and her grandparents had returned to Indiana to retrieve more of the family's belongings while she, RP, and respondent-father remained at the Michigan house. KP indicated that the incident took place on a couch in the living room of the new house. KP further indicated to Lozano that there was a "separate incident" between respondent-father and KP in a hallway, though she did not provide more details about it. KP did not indicate to Lozano that she ever saw anything happen between respondent-father and her sisters. Lozano denied having any indication that KP was being coached, though she acknowledged being unable to determine for certain whether a child is being coached and indicated that she had "to take the child [at] their word at that point." Lozano confirmed her belief that KP was telling the truth.

Regarding the CPS report about the grandfather, Lozano testified that there were "concerns that he was sexually abusing [KP] as well." Lozano referenced a report indicating that KP "did not want to take a shower at her own household, that it was only at grandpa's house, that she was sitting on his lap, only wanted to sit on his lap, things like that." KP did not, however, disclose any abuse by the grandfather, Lozano testified. According to Lozano, KP reported that "[g]randpa would let her stay up, eat candy," and from Lozano's perspective demonstrated "just things that a kid would typically like, especially from their grandfather or other family member." Lozano found "an indication that it was a good relationship" between the grandfather and KP.

After KP's interview with Lozano, the mother returned to Indiana with two of her children[7] and dropped them off at her parents' house. At the time, the mother was having suicidal thoughts because of the abuse against KP. The mother herself had "a history . . . of being molested" and it was "the last thing [she] ever had wanted to happen to [her] child, and so [she] felt like [she] had failed [KP]." The mother then intentionally drove into a ditch to "hurt [her]self . . . ." She was thereafter transported to an Indiana hospital.

## D. TERMINATION PROCEEDINGS

In late September 2022, the same day the mother was hospitalized, the Michigan Department of Health and Human Services (MDHHS) petitioned the court to exercise jurisdiction over the four children, remove them from the home, and terminate respondent-father's parental rights to each child. According to the petition, KP disclosed at a Child Advocacy Center interview that respondent-father " 'touched [her] private parts' " and " 'put one finger in [her] butt' " at the family's home in Michigan. She also reported that sexual abuse happened when the family lived in Indiana. KP denied that the abuse happened to the other children. The court ordered removal

---

[7] It is unclear which children the mother had with her at the time. The petition alleged that the grandmother had reported on the day of the mother's accident that "two of the children are in Michigan in school with no one to pick them up."

of the children and placed them in the care of MDHHS the same day the petition was filed.[8]  The trial court then authorized the petition in early October 2022.[9]

In early March 2023, the trial court held an adjudication hearing related to respondent-father.  The mother and respondent-father testified about the circumstances of KP's allegations of sexual abuse against respondent-father.  Lozano and Harper also testified about the allegations.  After the testimony, the trial court found that a preponderance of the evidence established grounds for jurisdiction under MCL 712A.2(b)(2).  In doing so, it stated the correct standard, listed the witnesses who testified, and stated:

> There is no question that [KP] made these statements, as set forth in the Petition.  I mean, that's been established.  The question is again, you know, who do you believe, but even setting that aside, the fact that she made these statements and the fact that we have this situation, which from what I can see, based upon the in-laws and other things going on, I find that by a preponderance of the evidence that that in and of itself would rise to the level that the environment is not appropriate for these children.

Regarding the conflicting evidence presented at the hearing, the court stated:

> Looking at the weight of the evidence, I mean it definitely tips in favor of the Department here with regard to the statements that were made and whether or not they are true.  I find that I have no reason not to believe that.  [Respondent-father] has certainly put forward certain things here and there may be motivations for her to say it, et cetera, but I don't believe anything that rises to the level that would tip the scale otherwise.

In mid-May 2023, the trial court held a termination hearing related to respondent-father.[10]  Respondent-father and Sarah Hobi, a foster care worker who was assigned to the case in January 2023, testified at the termination hearing.  The mother's brother, Marcus Plummer (Marcus), also testified at the hearing.  Respondent-father denied the allegations against him and testified about his relationship with his in-laws and KP's behavior leading up to the allegations.  He also testified that in mid-2021 the mother disclosed her own experiences with sexual abuse.  One incident related

---

[8] The petition referenced the mother's suicidal thoughts, and alleged that in addition to the sexual abuse, the children were also left without proper care and custody because of the mother's hospitalization.

[9] Several of the hearings related to the mother and whether the children should be returned to her care.  Though they were eventually returned to the mother in February 2023, she asked in mid-February 2023 that they again be removed because "she could not handle them," citing her mental health.  MDHHS therefore moved for removal of the children in mid-February 2023 and the court granted the motion.

[10] As of the May 2023 termination hearing, the children were placed in two separate foster care homes.  KP and RP were together in one home, and IP and PP were in another.  None of the four children were placed with relatives.  The plan was to reunify the children with the mother.

to abuse by her grandmother's ex-husband. The other, however, related to abuse by her father, KP's grandfather. According to respondent-father, the mother told him that she informed her freshman guidance counselor that the grandfather "started sending her sexually explicit messages" and "CPS had become involved."

Marcus testified about his relationship with his parents and his experiences with respondent-father. Marcus described respondent-father as "passionate," "caring," and "overall a good person." As a father, Marcus testified, respondent-father was the "primary care provider for them at home" and had a "[v]ery good" relationship with his daughters. Marcus denied ever having seen respondent-father act inappropriate with any of his four children and did not believe respondent-father was capable of the acts he was alleged to have done. He testified, however, that he noticed "big, big, big change[s]" in KP's behavior as she got older and that were typically worse after she returned from the grandparents' house. Marcus described KP's behavior as "very insubordinate," indicating that she "would touch herself inappropriately" and would "act out." On cross-examination, Marcus indicated that he experienced KP lying about "silly things, small things, very small things." He also indicated that, on one occasion at the home of respondent-father and the mother, he heard KP say that she "only bathe[d] at" the grandparents' house. Marcus also mentioned having found inappropriate TikTok videos KP had made at her grandparents' house, noting that the grandmother had recorded some of the videos.

Regarding the grandfather, Marcus described his father as "very vindictive," "a narcissist," "a liar," and "everything that they're saying [respondent-father] is . . . ." Marcus stated that he "grew up in that house, so [he] kn[e]w exactly what it's like," testifying that the grandfather coached him into lying. Marcus believed the grandfather coached KP to "say these things and to keep her story straight." When asked what kind of hold the grandfather had over KP for her continue to lie months later, Marcus responded that the grandfather had led KP "to believe that he [was] her hero" and that he was perfect. When he first heard the allegations against respondent-father, Marcus's initial reaction was "[t]hat it was planned from the get-go." He explained that the grandfather was a "very big bully" toward respondent-father, "always calling him names, always said he was a bad father, a poor role model . . . ." Marcus denied trusting his parents and confirmed his belief that they had something to do with the allegations against respondent-father. He indicated that he knew his "mother and father, and [his] sister better than anybody and this was 100 percent planned, 100 percent." Marcus also believed the children would be safe if they were returned to respondent-father's care, stating the respondent-father was "more of a victim" and was "not guilty." Marcus further stated that the grandparents had previously threatened him and his wife and falsely accused Marcus of molesting his infant son. Because of the grandparents' threats and accusations, Marcus got a personal protection order against them in early 2023.

After the testimony, the trial court found that clear and convincing evidence supported termination under MCL 712A.19b(3)(j) and (k)(*ii*). The court indicated that, "[b]ased upon the testimony at trial," it was "clearly convinced that something of a sexual nature happened to [KP], so I am clearly convinced of that." "The difficulty," the court explained, was whether there was sufficient evidence warranting termination at the initial dispositional stage. The trial court found that the evidence "point[ed] toward father" as the abuser and that there was a reasonable likelihood of future abuse, stating "I would be putting this child back in an environment in which she was sexually abused." It therefore found that "the statutory criteria [for MCL 712A.19b(3)(k)(*ii*)] has been met." Regarding MCL 712A.19b(3)(j), the trial court found clear and convincing evidence

that there was a reasonable likelihood of harm based on respondent-father's conduct or capacity. The court noted that a parent's treatment of "one child is evidence of how they will treat others" and expressed concern that "these children are all special needs children, nonverbal, autistic, [with] delays." It further noted that respondent-father lived in a one-room motel room, that he had lived there for "quite some" time, and that it did not believe there was a reasonable likelihood respondent-father would be in a situation to properly care for his children. After addressing the statutory grounds for termination, the trial court found it was "in the best interests for all four of these children to have safety and security, so at this point in time I am going to enter an order terminating father's rights." The trial court did not revisit or otherwise address the conflicting evidence related to KP's alleged abuse or the grandparents' involvement. It entered an order terminating respondent-father's parental rights the same day as the termination hearing. This appeal followed.

## II. STANDARD OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). We review for clear error the trial court's decision that statutory grounds for termination have been proven by clear and convincing evidence, as well as its determination that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. "Best interests are determined on the basis of the preponderance of the evidence." *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018) (quotation marks and citation omitted). "This Court gives deference to a trial court's special opportunity to judge the weight of the evidence and the credibility of the witnesses who appear before it." *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014). Thus, "[a]ppellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009).

## III. STATUTORY GROUNDS

Respondent-father argues that the trial court clearly erred when it found that clear and convincing evidence supported termination of his parental rights under MCL 712A.19b(3)(j) and (k)(*ii*). We agree and address each statutory ground, starting with Subsection (k)(*ii*).

### A. MCL 712A.19b(3)(k)(*ii*)

Respondent-father argues that termination was improper under MCL 712A.19b(3)(k)(*ii*) because the evidence presented did not support this statutory ground and the trial court disregarded evidence suggesting that the allegations against him were false. We agree that termination was improper under MCL 712A.19b(3)(k)(*ii*) because the trial court failed to consider and address evidence that conflicted with and potentially undermined KP's allegations.

To terminate parental rights under MCL 712A.19b(3)(k)(*ii*), a trial court must find clear and convincing evidence that "[t]he parent abused the child or a sibling of the child," the abuse

-9-

included "[c]riminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate," and "there is a reasonable likelihood that the child will be harmed if returned to the care of the parent[.]"  "[A] parent need not be criminally charged with or convicted of criminal sexual conduct (CSC) for MCL 712a.19b(3)(k)(*ii*) to apply."  *In re Schadler*, 315 Mich App 406, 410; 890 NW2d 676 (2016).  To reiterate, although we generally defer to the trial court's "special opportunity to judge the weight of the evidence and the credibility of the witnesses who appear before it," *In re TK*, 306 Mich App at 710, we need only "defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error," *In re Rood*, 483 Mich at 90.

This Court in *In re ASF*, 311 Mich App 420, 429; 876 NW2d 253 (2015), confirmed that "[t]he clear and convincing evidence standard is the most demanding standard applied in civil cases . . . ."  (Quotation marks and citation omitted.)  Under this standard, evidence is clear and convincing when it:

> produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, *evidence so clear, direct and weighty and convincing* as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. [*Id*. (brackets and citations omitted; emphasis added.)]

We are definitely and firmly convinced that the trial court made a mistake when it found that clear and convincing evidence supported termination under MCL 712A.19b(3)(k)(*ii*).  The trial court found that clear and convincing evidence supported a finding that "something of a sexual nature happened to [KP]" and "point[ed] toward father" as KP's abuser.  Evidence supported these findings: KP's statements to her mother over the phone about the abuse, the mother's testimony that she believed KP's allegations, and testimony from Harper and Lozano regarding KP's allegations, including never wavering from identifying respondent-father as her sole abuser.

But the trial court ignored other evidence that conflicted with and undermined the evidence pointing to respondent-father as the abuser, specifically, testimony from the mother, her brother (Marcus), and respondent-father suggested that the grandfather coached KP into making the allegations against respondent-father and that someone other than respondent-father may have sexually abused KP.[11]  Notably, respondent-father and the mother testified about the animosity between the grandparents and respondent-father, the grandparents' threats against them—including calling CPS—and behavior by the grandfather that could have been viewed as inappropriate with respect to KP.  Marcus also testified about his relationship with his parents and described the situation with respondent-father as "100 percent planned" by the grandparents.  He further testified that the grandparents had accused him of "molesting" his infant son.  There is also

---

[11] In addition to the possibility that someone other than respondent-father sexually assaulted KP, we sadly must acknowledge the possibility that someone in addition to respondent-father may have sexually assaulted KP.  This nuanced consideration (and possible explanation for the conflicting evidence) is also absent from the trial court's findings.

no indication that the trial court considered that it was the grandfather who initiated and was present for the phone call during which KP first alleged that respondent-father abused her. The trial court did not address whether or how any of this evidence affected its credibility determinations or whether it otherwise affected its findings related to this statutory ground. The trial court should have considered all of this evidence when determining whether termination was appropriate under MCL 712A.19b(3)(k)(*ii*). Perhaps most critically, the court made no mention of the content or credibility of Marcus's testimony, which, at least on its face, appears to significantly undercut the strength of KP's allegations against respondent-father. It may be the case that the trial court did not find that testimony credible. But in light of the testimony from the mother and respondent-father about the poor relationship between the grandparents and respondent-father, Marcus's testimony raises significant questions about the strength of KP's allegations. The trial court should have considered and addressed the effect and credibility of Marcus's testimony and others on this relationship.

Because the trial court failed to address significant evidence suggesting that KP's allegations against respondent-father were either fabricated or aimed at the wrong person, we conclude that the trial court clearly erred in terminating respondent-father's parental rights under MCL 712A.19b(3)(k)(*ii*). We do not opine on whether the evidence ultimately supports termination under this statutory ground. But the court made a mistake when it did not evaluate all of the relevant evidence and make specific fact findings; it should have addressed Marcus's testimony (whether it found it credible or not) and explained how it could reconcile its conclusion that respondent-father was the abuser in light of other evidence suggesting the grandfather may have been involved in at least coaching KP into making the allegations in this case.

## B. MCL 712A.19b(3)(j)

Respondent-father also argues that the trial court clearly erred by terminating his parental rights under MCL 712A.19b(3)(j). For the same reasons articulated under Subsection (k)(*ii*), we agree.

To terminate a parent's rights to their child under MCL 712A.19b(3)(j), a trial court must find by clear and convincing evidence that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." "The harm contemplated under MCL 712A.19b(3)(j) includes emotional harm as well as physical harm." *In re Sanborn*, 337 Mich App 252, 279; 976 NW2d 44 (2021).

The trial court clearly erred when it terminated respondent-father's parental rights under MCL 712A.19b(3)(j). Although the court addressed respondent-father's living situation, its evaluation of this factor focused on the alleged sexual abuse. Noting that a parent's treatment of "one child is evidence of how they will treat others" and expressing concern that "these children are all special needs children, nonverbal, autistic, [with] delays," but without further explanation, the court found clear and convincing evidence that there was a reasonable likelihood of harm based on respondent-father's conduct or capacity. As explained above, however, because evidence called into question the veracity of KP's allegations against respondent-father and the trial court failed to address it in its evaluation of this statutory ground, we are definitely and firmly convinced that the trial court made a mistake. Notably, the allegations directly contributed to respondent-father's living arrangements that formed part of the trial court's considerations despite the fact that

the approved safety plan required his move out of the house. We stress again that we do not express a position on whether the evidence ultimately supports termination. We simply conclude that the trial court could not come to a proper determination without evaluating *all* of the evidence—including the evidence related to the grandfather—and explaining that to better facilitate appellate review. Because the trial court failed to consider the significant evidence suggesting that the allegations were either fabricated or may have focused on the wrong person, we conclude that it clearly erred in terminating respondent-father's parental rights under MCL 712A.19b(3)(j).[12]

## IV. REASONABLE EFFORTS

Our conclusion that the trial court erred in finding clear and convincing evidence supporting termination under MCL 712A.19b(3)(k)(*ii*) and (j) inevitably leads us to the conclusion that it also erred by failing to make reasonable efforts at reunification. See MCL 712A.19a(2)(a). See also *In re Simonetta*, 340 Mich App 700, 707; 987 NW2d 919 (2022). Here, although the trial and termination hearing were separated by two months, this case involved a termination at adjudication. Absent specific findings regarding aggravating circumstances, the trial court was required to make reasonable efforts at reunification. See *id*. On remand, the trial court must make those efforts.

MCL 712A.19a(2)(a) provides, "[r]easonable efforts to reunify the child and family *must be made in all cases*" unless, relevant here, "[t]here is a judicial determination that the parent has subjected the child to aggravated circumstances as provided in" MCL 722.638 (emphasis added). Under MCL 722.638(1)(a)(*ii*), aggravated circumstances of child abuse include "criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate." Regarding these requirements, we have held

> The Legislature has expressed an unmistakable preference that the DHHS offer services to every parent at risk of losing parental rights. Services typically include drug treatment, psychological evaluation and support, and housing assistance. The reasonable-efforts mandate is intended to reinforce and to accentuate the DHHS's goal: reunification. Withholding reasonable efforts is a narrowly drawn exception to the legislative preference that the DHHS actively engage with parents to keep families together. [*In re Simonetta*, 340 Mich App at 707.]

---

[12] Because we vacate and remand for clarity on the evidence supporting the statutory grounds for termination of respondent-father's parental rights, we need not address his arguments about the trial court's best-interest determinations. See MCL 712A.19b(5). Having reviewed the issue, however, we conclude that the court's best-interest determination was inadequate. On remand, should the trial court again find that statutory grounds support termination of respondent-father's parental rights, it should ensure to consider the best-interest factors and evaluate them on the record consistent with caselaw. See *In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014).

Most of the six "aggravated circumstances" in MCL 722.638(1) "are likely to be the subject of criminal prosecutions. They represent demonstrably violent or indisputably abusive conduct that causes long-lasting harm." *Id*. at 708.

To terminate parental rights "at initial disposition and without reasonable efforts at reunification, a court must find on the basis of *clear and convincing legally admissible evidence* that the facts alleged are true, that at least one statutory ground for termination has been established, and that termination is in the child's best interests." *Simonetta*, 340 Mich App at 712 (cleaned up; emphasis added). On the first application for leave in *Simonetta*, the Michigan Supreme Court held that pursuant to *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010), "[r]easonable efforts to reunify the child and family must be made in all cases except those involving the circumstances delineated in MCL 712A.19a(2)." *In re Simonetta*, 507 Mich 943 (2021). The Court therefore ordered the circuit court on remand to "either order that the petitioner provide reasonable services to the respondent, or articulate a factual finding based on *clear and convincing evidence* that aggravated circumstances exist such that services are not required." (Emphasis added.)

On remand, the trial court must provide reasonable efforts at reunification to respondent-father unless it finds "clear and convincing evidence" of aggravating factors involving him which produces "a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct, and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re ASF*, 311 Mich App at 429. While the trial court may be convinced that some inappropriate sexual conduct happened to KP, the focus of its inquiry must be whether there is clear and convincing evidence that respondent-father was responsible for the alleged criminal sexual assault. Only that (or some other proscribed aggravating factor) would be sufficient to deny respondent-father the opportunity to work a treatment plan and seek reunification with his children. Here, the trial court failed to recite the clear, direct, weighty and convincing evidence that respondent-father committed these acts and, as a consequence, was not entitled to reasonable efforts to reunify with his children. MCL 712A.19a(2)(a); MCL 722.638. This error was separate from, but related to, the errors in statutory grounds as described above.

## V. CONCLUSION

We vacate the order of termination and remand for the trial court to provide respondent-father with a case services plan because there were insufficient facts and findings for the trial court to find that respondent-father subjected the children to aggravated circumstances as required under MCL 712A.19a(2). We do not retain jurisdiction.

/s/ Kathleen A. Feeney
/s/ Michelle M. Rick
/s/ Noah P. Hood